**Willis N. BROWN, Jr., Plaintiff, Appellant,**

**v.**

**HEARST CORPORATION, d/b/a WCVB– TV Channel 5, Defendant, Appellee.**

**No. 94–1836.**

United States Court of Appeals, First Circuit.

Heard Jan. 11, 1995.

Decided May 11, 1995.

---

Edwin M. Sigel, Dallas, TX, for appellant.

Steven J. Comen with whom Patricia A. Lipoma and Goodwin, Procter & Hoar, Boston, MA, were on brief, for appellee.

Before CYR and BOUDIN, Circuit Judges, and KEETON,* District Judge.

BOUDIN, Circuit Judge.

In March 1987, Regina Brown, the then-wife of appellant Willis Brown and mother of three children, disappeared. At the time Regina was employed as a flight attendant, and Willis as a pilot, for American Airlines; the couple had lived together in Newtown, Connecticut, but had been separated for four months and were living apart. The police investigated the disappearance and found Regina's car abandoned in New York but no trace of her. The investigation remains open. It is not known whether Regina is alive or dead.

Later in the same year the Browns were divorced in a Connecticut state court, the contested proceedings being completed in Regina's absence. The state court trial was

prolonged and a detailed opinion was written by the trial judge pertaining to custody and support. The opinion, dated April 22, 1988, found that Willis believed deeply but without basis that his wife was unfaithful to him, that his charges against her echoed charges that he had made against his first wife, that "he [had] physically and mentally abused [Regina]," and that he had threatened to kill her and the children.

The trial was widely reported in the press, and publicity continued even after the decree. This was due partly to further litigation and the continuing police investigation, but also to a freakish coincidence. About six months before Regina's disappearance, another woman who lived in Newtown, a Pan Am flight attendant married to an Eastern pilot, had disappeared. Fragments of her bone were found in a nearby river, and her pilot husband was convicted in the so-called woodchipper murder.

In November 1990, appellee Hearst Corporation d/b/a WCVB–TV Channel 5 in Boston ("Channel 5") broadcasted from Massachusetts a segment entitled "The Other Pilot's Wife" as a part of the station's regular "newsmagazine" program. It was prepared by Mary Richardson, a journalist with the station, who conducted a substantial amount of research and a number of interviews in preparing the broadcast.

The broadcast opens with the leitmotif—"Tonight the bizarre story of a small New England town where one stewardess is dead, another is missing"—and then offers a brief reprise of the 1986 murder of the Pan Am flight attendant. Next, turning to the Browns, the broadcast describes and depicts an apparent storybook marriage going sour, the divorce petition, and Regina's disappearance. "In the days following Regina's disappearance," says Richardson, "Willis showed no interest in what had happened to her."

The program reenacts a last telephone call from Regina to a friend, according to the friend's report:

> I'm in danger. If my parents say they haven't heard from me on Sunday ... be alarmed. Wait two days, call back. If I'm

* Of the District of Massachusetts, sitting by desig-

nation.

not there by then, Willis will have done to me what he's promised to do to me.

The police chief is then quoted as saying that Willis had told him to look for Regina's car in a drug infested area of a big city; and that in fact the car was found pretty close to such an area.

In the next portion of the segment, Willis is described as having at first agreed, and then refused, to take a lie detector test. Evidence offered at the divorce trial is recounted or summarized. The evidence included descriptions of Willis' accusations against his wife which are portrayed as virtually paranoid; the trial judge's statement that Willis had physically and mentally abused Regina; and a vivid strangulation scene that one of the Brown children allegedly recounted to Regina's parents.

In the final few minutes, there are interviews with Regina's parents who now have custody of the children. Her father says, "I feel like if Regina's dead, [Willis] killed her, or had her killed." Her mother adds, "I don't think Regina is alive." The broadcast also includes the police discovery of a hand drawn map of Block Island, depicting an area where Willis had rented a house trailer shortly before Regina's disappearance and bearing the words "Regina, O God." An extensive police search of 37 acres, the program concludes, produced no trace of any wrongdoing.

There is other incriminating information about Willis recounted in the program, and the police are described as having suspected Willis and as believing still that "Mr. Brown knows more about the disappearance of his wife than he is letting on." No evidence even remotely exculpatory of Willis is described. On the other hand, Mary Richardson, the "voice over" throughout the program, never asserts that Willis is guilty or even says that she thinks he is guilty. Formally, the program describes the disappearance as a mystery or, at worst, a possible murder still unsolved.

In February 1993, Willis brought the present action against Channel 5 in state court in Texas. The case was removed to federal court and thereafter transferred to the federal district court in Massachusetts. As subsequently amended, Willis' complaint charged defamation, invasion of privacy under Mass. Gen.L. ch. 214 § 1B, "false light" invasion of privacy, and intentional infliction of emotional distress.

After discovery, Channel 5 moved for summary judgment. In a detailed opinion dated July 21, 1994, the district court granted the motion. As to the defamation claim, the court relied in different respects on lack of falsity, the limited protection available for statements of opinion, the "fair report" privilege, and lack of fault. The privacy and intentional infliction claims were dismissed on grounds described below. Willis has now appealed, asserting that all of his claims should have been submitted to a jury.

■■■■ On appeal from a grant of summary judgment, we review the decision *de novo*, drawing inferences in favor of the party opposing the motion. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). Because the case was transferred from Texas, Texas law governs the choice of substantive law to be applied. *Putnam Resources v. Pateman*, 958 F.2d 448, 465 (1st Cir.1992). The district court found that Texas would apply Massachusetts law in judging the broadcast and, as this ruling has not been challenged on appeal, our discussion assumes this to be so.

Although Willis listed defamation as the fourth and last count of his second amended complaint, this charge has been the center of the controversy both in the district court and on appeal. As framed on this appeal, Willis' main attack on the broadcast is that it amounts to a charge that he murdered his wife. Additionally, he argues that the broadcast suggests that he did so "in the same manner" as the earlier pilot (who had dismembered his wife's body with a woodchipper).

■■■■ Channel 5 does not appear to dispute that the broadcast charges Willis with murder or at least that a jury would be entitled to find this to be the import of the program. The broadcast never flatly expresses that accusation. Indeed, it says that the murder is unsolved and makes clear that

the police have nothing much in the way of direct evidence against Willis. But defamation can occur by innuendo as well as by explicit assertion, *Mabardi v. Boston Herald–Traveler Corp.*, 347 Mass. 411, 198 N.E.2d 304, 306 (1964), and the suggestion here is a fairly strong one.

The materials presented include—we stress that some are merely allegations—the rift between Willis and Regina; his paranoid accusations against her; his threats to kill her and the children; her statement (to a girlfriend) that Willis might be planning to do "what he had promised"; her disappearance and Willis' disinterest; his visit to the house on the same night; and his knowledge of where her car might be found. The notion that Regina would have left her children voluntarily is scotched and there is no hint of another motive, or perpetrator.

The broadcast makes clear that the police suspect Willis, and Regina's parents are filmed making even stronger statements of suspicion. Material from the divorce trial is used to establish or buttress doubts about Willis' character and history. The suggestion of murder runs through the program like a gold thread. The broadcast opens with the dramatic footage relating to the woodchipper murder and closes with Richardson's rhetorical question, could "someone" get away with murder?

■ A common defense to a charge of defamation is "truth." The Supreme Court tells us that in a suit like this one against the media the burden is upon the defamed plaintiff to show that the statements are not true. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Neither side addresses this issue. Perhaps each assumes that to carry his burden of proof, Willis could testify at trial that he did not murder his wife and a jury might believe him. In all events, we take the case as one in which a jury might find that murder had been charged and that the charge was false.

■ Channel 5's primary response is that "[m]uch of the [b]roadcast, and the entirety of its allegedly defamatory sting, is in essence a 'fair report' of the Browns' divorce trial in Connecticut" and thus falls under the Massachusetts privilege allowed for media coverage of an official proceeding. Such a privilege certainly exists in Massachusetts, e.g., *Jones v. Taibbi*, 400 Mass. 786, 512 N.E.2d 260, 266 (1987), and there is little doubt that much of the material in the broadcast is drawn from, and attributed to, the divorce proceeding.

For present purposes, we will assume that the privilege extends to non-contemporaneous reports and that the program—so far as it related to the divorce proceeding and the information developed there—conveyed a fair and accurate report of the proceeding. But only a portion of the broadcast purported to be drawn from the proceeding. And, while that portion may be privileged, we are skeptical of Channel 5's claim that the entire "sting" of the broadcast is privileged material.

The "sting" or "gist" notion comes from Massachusetts' cases involving such questions as whether a reporter's "rough-and-ready summary" of a proceeding is "substantially correct." *MiGi, Inc. v. Gannett Mass. Broadcasters, Inc.*, 25 Mass.App.Ct. 394, 519 N.E.2d 283, 285 (1988). It is not clear to us that these concepts apply in quite the same way when we are dealing with a broadcast that is not by any stretch merely a report of the much earlier official proceeding. Rather, Channel 5 has used the earlier material as *part* of a larger and more comprehensive structure.

This structure differed in two ways from the divorce proceeding. It included evidence in addition to that presented in the proceeding (e.g., police interviews; the map found on Block Island). And it used techniques (voice overs, filmed interviews, recreations) and rhetoric—especially the doubtful analogy of the woodchipper murder—that sharpen the cutting edge of the implicit charge. Where the evidence is thus enlarged and the charge cast in a more lurid light, it is not clear to us that the fair report privilege automatically shields the larger whole.

■ The problem for Willis, we think, is that the Supreme Court has instructed that a state libel-suit plaintiff must demonstrate

fault on the part of the media; and this requirement applies even where the plaintiff is not a public official or public figure. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974). In such cases Massachusetts has imposed a requirement that the newspaper or broadcaster be shown to be negligent or worse. *Jones v. Taibbi*, 400 Mass. 786, 512 N.E.2d 260, 267 (1987). Thus, even if a false charge of murder has been made, it remains to see whether Willis provided evidence of negligence to justify submitting the case to a jury. For this purpose, the First Amendment establishes a minimum standard and we are concerned here with "negligence" only in this special constitutional sense; Massachusetts is free to define negligence differently in any other context or to require more than constitutionally defined negligence in a libel case.

So far as the murder goes, Willis points to nothing to suggest that Channel 5 was negligent in its mustering of the available evidence. Some might think the broadcast gaudy journalism; certainly the interpolation of the woodchipper murder is largely gratuitous. But so far as guilt or innocence is concerned, Willis directs us to no significant inaccuracies in Channel 5's depiction of evidence. Nor does he point to any counterbalancing exculpatory evidence that Channel 5 wrongly withheld or that it would have discovered by diligent research.

Willis' brief says tersely that the police admitted that they had no evidence against him; and he reasons that it was thus "negligent disregard for the truth" for Channel 5 to "insinuate" that "[he] murdered his wife and disposed of her body in the same fashion as did [the woodchipper murderer]." But the short answer is that substantial circumstantial evidence pointed to Willis as a suspect and—so far as we know—the only suspect. That does not mean that he was guilty or even that there was a basis for prosecution—which is likely what the police meant to say.

A different problem is presented by Willis' suggestion that the broadcast charged him with disposing of his wife's body "in the same fashion" as the woodchipper murderer. Patently, the broadcast did not so charge; no reasonable juror could draw such an inference. Willis offers no argument to support such an inference, and it is not surprising that elsewhere in his brief he retreats to a more cautious assertion: that the juxtaposition "conveys the message that Brown also murdered his wife and disposed of her body *in some insidious fashion*" (emphasis added).

Many might think that the manner of disposing of the body adds very little to a charge that someone murdered his frightened wife and left her small children motherless. Others, perhaps, would think that the destruction of the body added a further note of horror and that even a fiend's reputation may be worsened. *Compare Jackson v. Longcope*, 394 Mass. 577, 476 N.E.2d 617 (1985). Further, it may also be true—this is a close question—that the broadcast could be taken as insinuating that Regina's body was disposed of "in some insidious fashion."

Even if all of these doubts are resolved in Willis' favor, we think this narrow remaining claim is too thin to survive summary judgment. About the most one can get from the woodchipper episode is the suggestion that, if Willis killed his wife, he also took steps to assure that her body would not be found. But this is about what one would expect of a murderer who intended to use the absence of a body as part of his defense. Perhaps such a concealment could be fairly called "insidious" but it is not an act that adds measurably to the taint of deliberate murder.

By contrast, a brutal destruction of the body might add to the taint, but no such charge is made by the program. The woodchipper murder was offered as a remarkable coincidence but not as a blue-print for Regina's death. To the extent that Willis is arguing that the program implies that he brutally destroyed Regina's body, we do not think that a reasonable juror could draw such an inference—any more than the juror could believe that a woodchipper was used in her death. Without laying great weight on this point, we note that courts often say that it is a question for the judge whether the defendant's statement is capable of a particular defamatory reading. William Prosser & Page Keeton, *Torts* 781 (rev. ed. 1984).

■ It is quite true that the woodchipper episode at the start of the broadcast laid the groundwork for the program to insinuate that Willis had murdered his wife by brutal means. But while much else in the rest of the program developed and accentuated the charge of murder, virtually nothing tended to suggest that the body was brutally destroyed. A writing or program is normally viewed as a whole, Prosser & Keeton, *supra*, at 781; and that requirement has special force here because the woodchipper episode was assertedly about someone else, and its connection to Willis depended upon the rest of the program. We conclude as a matter of law that the broadcast, taken as a whole, cannot reasonably be taken to charge that Willis brutally disposed of his wife's body.

■ Willis' non-libel claims do not require much discussion. On appeal, Willis' has narrowed his privacy claim to the contention that the program places him in a false light by leaving the viewer with "a false impression," *i.e.*, that Brown killed Regina and disposed of her body in the same fashion as did the woodchipper murderer. The district court thought it sufficient that Massachusetts has never adopted the false light theory of privacy invasion, *see Elm Medical Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 532 N.E.2d 675, 681 (1989), and that diversity cases are not ordinarily an occasion for federal courts to pioneer in developing new state law.

We think it worth adding that "false light" privacy claims are not all of a piece, but Willis' claim is simply a restatement of his defamation claim under a different heading. That being so, it is not imaginable that it could escape the same constitutional constraint as his defamation claim. *Time v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1976). In short Willis would still have to show not only falsity but negligence, but he has offered no evidence of negligence sufficient to get him to a jury.

■ Lastly, Willis charged Channel 5 with intentional infliction of emotional distress. This is a recognized tort under Massachusetts law requiring intended or foreseeable infliction of such distress, "extreme and outrageous conduct," and causation of distress so severe that no reasonable person could be expected to endure it. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 319 (1976). The district court said that Channel 5's conduct was not negligent and therefore could hardly be "extreme and outrageous."

■ In all events, many of the legitimate news stories that appear in the media involve foreseeable distress for the subject of the story, probably severe distress in some cases. Regina's disappearance and the divorce trial were news stories, and so was her continued absence and the failure of the police to solve the case. Willis provides no basis to think that generally accurate coverage in such a case is even remotely close to conduct "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Agis*, 355 N.E.2d at 319 (quoting other authorities).

*Affirmed.*