Terri STOKES, Plaintiff,

v.

CBS INC., d/b/a WCCO Television; King World Productions; Tom Johnson; and the County of Anoka, Minnesota, Defendants.

Civ. No. 4–96–178 (DSD/JMM).

United States District Court, D. Minnesota.

Nov. 2, 1998.

Joseph Stuart Friedberg, Friedberg Law Office, Minneapolis, MN, Robert R. Weinstine, Winthrop & Weinstine, St. Paul, MN, Charles Lee Hawkins, Hawkins Law Office, Minneapolis, MN, Melissa A. Arndt, Winthrop & Weinstein, Minneapolis, MN, for Terri Stokes.

John Philip Borger, Eric Edwin Jorstad, Faegre & Benson, Minneapolis, MN, Susanna M. Lowry, Cameron A. Stracher, CBS Inc., New York, NY, for CBS, Inc.

Mark R. Anfinson, Anfinson Law Office, Minneapolis, MN, for NBC, Inc.

Anthony Charles Palumbo, Anoka County Attorney, Anoka, MN, for Tom Johnson, County of Anoka.

John Philip Borger, Eric Edwin Jorstad, Faegre & Benson, Minneapolis, MN, Ralph E. Goldberg, Christine Hagan, New York, NY, for King World Productions.

## ORDER

DOTY, District Judge.

This matter is before the court on defendants' motions for summary judgment. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court denies defendants' motions.

## BACKGROUND

On October 30, 1993, Dennis Stokes was killed by a shotgun blast to the head while lying asleep in the bed of his Anoka County home. The Anoka County Sheriff's Department promptly began an investigation, led by Deputy Tom Johnson. Almost immediately Johnson focused on Dennis's wife, Terri Stokes, as the prime suspect. Nonetheless, despite Johnson's conclusion that Terri Stokes had both the motive and the opportunity to kill her husband, a five-month investi-gation uncovered little evidence connecting Terri Stokes to the murder.

Toward the end of this period, Johnson was approached by WCCO, a local television station, which expressed interest in airing a report updating viewers on the progress of the investigation. After consulting with his superiors, Johnson informed Tom Gasparoli, the WCCO reporter working on the story, that his only suspect in the case was Terri Stokes. On April 4, 1994, Gasparoli's report was broadcast as that evening's "Dimension" segment. Statements by Johnson regarding Terri Stokes's involvement in her husband's murder were the centerpiece of the broadcast.

Months later, on December 23, 1994, the nationally syndicated news show American Journal broadcast its own story on Dennis Stokes's murder, reported largely by Lauren Thierry. Once again, statements by Johnson about Terri Stokes played a primary role in the broadcast. At the time of the American Journal report, Johnson's investigation remained at a standstill and Terri Stokes had moved to Idaho.

Early in 1996, Stokes filed this action in federal court. Having since that time agreed to the dismissal of certain claims and parties, Stokes now sues defendants Tom Johnson, Anoka County, CBS (doing business as WCCO), and King World Productions (producer of American Journal) for defamation. Jurisdiction is based on diversity of citizenship.

Specifically, the defamation claim arises from statements made during the April 1994 WCCO broadcast and the December 1994 American Journal broadcast. Both broadcasts will be discussed in detail below. The parties have stipulated, however, that any defamatory meaning conveyed by the defendants in this case emerges from the following language. Language in brackets is included for context.

### WCCO Broadcast

Johnson: Somebody walked directly to the house, up the stairway, into the bedroom and, it appears, shot him while he was sleeping. The gun was pressed to his

head and (she)[1] pulled the trigger. This was a personal thing. I think it was a well planned out, methodical execution of Dennis Stokes.

Gasparoli: [By his wife?]

Johnson: I believe so.

Gasparoli: [Do you have any doubts about the direction you are going?]

Johnson: No.

\* \* \* \* \* \*

Johnson: At this point, when you start focusing in on her, she tries to get away from the question. At this point she wants to use the bathroom, next minute she wants to talk to her dad. You know, you close her in and try to confront her; she runs.

**American Journal Broadcast**

Reporter: Even more shocking is that police believe the family man's killer was someone very close to home.

Johnson: This was a crime of passion.

\* \* \* \* \* \*

Johnson: [We don't have enough evidence to show, to prove that she did it beyond a reasonable doubt.] I think we have a lot of reasons why.

\* \* \* \* \* \*

Thierry: [You're one hundred percent sure that Terri killed Dennis?]

Joyce Stokes: One hundred percent. There is no doubt about it. If she had somebody help her, maybe she did. But I think she planned it all, and I think she had been planning it for a long time.

\* \* \* \* \* \*

Thierry: We went to Terri Stokes' home \* \* \* to get some answers from

Terri about (Dennis Stokes')[2] death.

Reporter: [Accusation that Terri Stokes was] running off.

Thierry: Joyce Stokes was left with no answers to the questions she came all the way to Idaho to ask.

**DISCUSSION**

**A. Standard for Summary Judgment**

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. The nonmoving party, however, cannot rest upon mere denials or allegations made in the pleadings. Nor may the nonmoving party simply argue that facts supporting its claim may be developed later at trial. Rather, the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of the action under governing law. *See Anderson*, 477 U.S. at 248,

---

**1.** Parties do not stipulate that "she" was spoken by Johnson.

**2.** Parties do not stipulate that "Dennis Stokes" was spoken in this sentence.

106 S.Ct. 2505, 91 L.Ed.2d 202. If reasonable minds could differ as to the import of the evidence, summary judgment should not be granted. *See id.* 477 U.S. at 250–51, 106 S.Ct. 2505.

## B. Plaintiff's Prima Facie Defamation Claim

In Minnesota, to meet the elements of defamation, the plaintiff must " 'prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community.' " *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn.1996) (quoting *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410 (Minn.1994)). The court also plays an important threshold role in determining whether the communication possesses defamatory meaning:

> In libel cases a publication may be defamatory on its face; or it may carry a defamatory meaning only by reason of extrinsic circumstances. The question whether a claimed defamatory [meaning] is reasonably conveyed by the language used is for the court to determine. If the words are capable of the defamatory meaning, it is for the jury to decide whether they were in fact so understood.

*Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 653–54 (Minn.1982) (citations omitted). With these considerations in mind, the court will address whether (1) the communications complained of in the present case are reasonably capable of defamatory meaning, (2) Stokes has produced sufficient evidence that the communications are false, and (3) Stokes has produced sufficient evidence that she was harmed by the communications.

### 1. Defamatory Meaning

Defendants contend that the disputed communications are speculation and opinion that are incapable of being proven false and therefore do not convey an actionable defamatory meaning. The First Amendment provides a limited protection to defamation defendants. While "[u]nder the First Amendment there is no such thing as a false idea[,] . . . there is no constitutional value in

false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In evaluating the scope of First Amendment protection, the Supreme Court has rejected the "artificial dichotomy between 'opinion' and fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). As the Court observed in *Milkovich*, "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* 497 U.S. at 18, 110 S.Ct. 2695.

■ To distinguish between protected expressions of idea and actionable assertions of fact, Minnesota courts rely on the framework developed in *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.1986). *See Hunt v. University of Minn.*, 465 N.W.2d 88, 93–94 (Minn.Ct.App.1991); *Lund v. Chicago and Northwestern Transp. Co.*, 467 N.W.2d 366, 369 (Minn.Ct.App.1991). Under *Janklow*, courts evaluate whether a statement has defamatory meaning using four factors: (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement is made; (4) the statement's public context. *Janklow*, 788 F.2d at 1302–03. These factors are "considered together," and "the decision whether a statement is fact or opinion must be based on all the circumstances involved." *Id.* 788 F.2d at 1302.

The first *Janklow* factor, precision and specificity, addresses how susceptible a statement is to being understood as a factual assertion. "It is difficult to call a vague or imprecise statement a fact." *Id.* The second factor, verifiability, goes directly to whether a statement may be considered a "fact." Statements may be "phrased so that it is hard to establish a provable proposition," or the subject matter of the statement "may intrinsically be unsuited to any sort of quantification." *Id.* In addressing the issue of ambiguous subject matter, Minnesota courts have recently employed the doctrine of "substantial truth." *See Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn.Ct.App.1996); *Anjoorian v. Minneapolis Dep't of Public Safety*, CX–97–242, 1997 WL 527233 (Minn.Ct.App.

Aug. 26, 1997) (unpublished). Under this doctrine,

> A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances.

*Hunter*, 545 N.W.2d at 707; *see also Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 441 (Minn.Ct.App.1986) ("If the statement is true in substance, inaccuracies of expression or detail are immaterial.... 'A statement is substantially accurate if its gist or sting is true, that is if it produces the same effect on the mind of the recipient which the precise truth would have produced.'" (citations omitted)).

However, the U.S. Supreme Court has distinguished statements that are inherently unverifiable from statements that merely advertise themselves as opinion. There is a significant difference, the Court stated in *Milkovich*, between the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," which would not be actionable, and the statement, "In my opinion Mayor Jones is a liar," which would be. 497 U.S. at 19, 110 S.Ct. 2695.

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"

*Id.* 497 U.S. at 18–19, 110 S.Ct. 2695 (citing *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir.1980).

The Court continued:

> We note that the issue of falsity relates to the defamatory facts implied by a statement. For instance, the statement "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action
> ....

*Id.* 497 U.S. at 20 n. 7, 110 S.Ct. 2695.

■ The doctrine of substantial truth does not apply, therefore, to a specific, unambiguous statement, even if it is phrased as an opinion. Rather, "the court must look to the nature and obvious meaning of the language in its plain and ordinary sense, construing it as a whole, including innuendos reasonably laid from the statement." *Phipps v. Clark Oil & Refining Corp.*, 396 N.W.2d 588, 594 (Minn.Ct.App.1986).

The third *Janklow* factor addresses the immediate contextual factors that may affect the reception of a disputed statement. The publisher of a statement will often use tone or cautionary language to diminish or negate the overall defamatory effect. *See Janklow*, 788 F.2d at 1302. Further, the "category of publication, its style of writing and intended audience" may influence how a statement is understood. *Id.* 788 F.2d at 1303. For example, the *Janklow* court differentiated weekly news magazines from daily newspapers, observing that "magazines have a tradition of more colorful, even feisty language, than do dailies," embodying a "freer style of personal expression." *Id.* 788 F.2d at 1304. And in *Hunter v. Hartman*, the court held that the patently hyperbolic format of a radio sports talk show negated the possibility of defamatory meaning. *See* 545 N.W.2d at 707–08.

Nonetheless, literary context does not always erase a defamatory impression. *See Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695 (discussing the failure of the "general tenor"

of a disputed news article to overcome the defamatory effect of the statements within it). Some media—television in particular—can even exacerbate the defamatory effect:

> [T]elevision broadcasts add new and potentially significant variables to the defamation analysis. Courts must scrutinize the juxtaposition of the audio and video portions of a television program. In subtle ways, a television director can alter the tone of an otherwise innocuous broadcast. With the emerging popularity of self-styled "magazine" news programs, courts should be sensitive to the possibility that a transcript which appears relatively mild on its face may actually be, when the total mix of creative ingredients are considered, highly toxic. Indeed, a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic video accompaniment, can be devastating when packaged in the powerful television medium.

*Corporate Training Unlimited, Inc. v. National Broadcasting Co.*, 868 F.Supp. 501 (E.D.N.Y.1994) (citations omitted).

The fourth *Janklow* factor considers the broader public context in which a statement is made. "[W]hen determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment." *Id.* 788 F.2d at 1303. In *Janklow*, for example, where the disputed statement involved "criticism of the conduct of a state attorney general who now serves as governor," the court emphasized how vitally important it is to permit "press and citizens [freely] to discuss and, if they see fit, impugn the motives of public officials." *Id.* 788 F.2d at 1305.

As the *Janklow* court observed, "these four factors (particularly those of precision and verifiability) might best be met by criminal allegations." *Id.* 788 F.2d at 1305 n. 6. The present case bears out this observation. Whether the disputed statements are consid-

ered in isolation or in their full literary and social context, the court concludes that a television viewer could reasonably understand them to say that Terri Stokes killed her husband.[3]

### a. Deputy Johnson

█ Applying the *Milkovich* factors, the court determines that Johnson's statements are reasonably capable of a defamatory meaning. First, his disputed statements are precise. In the WCCO report, Johnson states, "I think this was a well planned out, methodical execution of Dennis Stokes." Reporter Tom Gasparoli then asks, "By his wife?" Johnson replies: "I believe so." Shortly thereafter, Gasparoli asks, "Do you have any doubts about the direction you are going?" Johnson replies, "No." In so many words, then, Johnson states that "I believe that Terri Stokes killed her husband." In fact, the slow, considered manner in which Johnson's comments emerge has the effect of focusing Johnson's assertions.

Second, Johnson's statements are verifiable. If "I think Jones lied" is a verifiable assertion of fact, as the *Milkovich* Court concluded, 497 U.S. at 19, 110 S.Ct. 2695, then Johnson's statement "I believe Stokes killed" must also be a provable assertion of fact. The substantial truth doctrine does not apply in this case because the assertion underlying Johnson's statement—that Stokes killed her husband—is not open to multiple interpretations.

Third, no other comments made by Johnson during the broadcast modifies the impression left by these words. Johnson's observation, as he narrates a videotaped portion of his interrogation of Stokes, that Stokes "runs" when "you close in and try and confront her" significantly adds to the accusatory tenor of his statements. And Johnson's grudging acknowledgment, at the prompting of Gasparoli, that Stokes is innocent until proven guilty does nothing to negate the force of his other comments.

Fourth, the public context in the present case is much different from that in *Janklow*.

---

3. Deputy Johnson's statements are, of course, the primary source of potential liability for each defendant. The court analyzes each defendant's communications separately, however, so as to give full consideration to their context.

The public-private dynamics are reversed. In *Janklow,* the plaintiff was a public figure subjected to published criticism originating from a private citizen. In this case, the plaintiff is a private citizen subjected to published accusations originating from a public official. If *Janklow* offered a scenario in which the value of public discourse outweighed the value of individual privacy, the present case balances out the other direction. All factors considered, therefore, Johnson's statements as they were published in the WCCO report are reasonably capable of a defamatory meaning.

Johnson's statements in the American Journal report are also capable of a defamatory meaning. In this report, Johnson states: "We don't have enough evidence to show, to prove that she did it beyond a reasonable doubt. I think we have a lot of reasons why." Although this statement is less precise than his statement in the WCCO report, Johnson clearly implies that he has "a lot of reasons why" *Stokes killed her husband.* Taken in context, Johnson's statement is only marginally less defamatory. While Johnson acknowledges that he lacks evidence to prove beyond a reasonable doubt that Stokes committed the crime, he also makes it plain that "We have only one suspect and that is his wife." Finally, the verifiability and public context factors apply to the American Journal statements in the same way they apply to the WCCO statements. Accordingly, the court finds that the statements Johnson made during both broadcasts are reasonably capable of a defamatory meaning.

**b. WCCO and American Journal Reports**

■ The court also finds that a reasonable person might draw a defamatory meaning from the WCCO and American Journal reports. Although, as a matter of social context, local television newscasts and syndicated news magazines often employ sensationalistic techniques, this fact alone does not protect them from defamation actions. Each report held itself out as a serious news investigation. Moreover, each report was built around the statements of Deputy Johnson, whose privileged position as the investigator in charge of the criminal investigation

would naturally enhance the credibility of the broadcasts.

Additionally, as regards literary context, each report employs techniques and rhetoric that greatly magnify the effect of Johnson's statements. The WCCO report is introduced by program anchors Don Shelby and Cindy Hillger, who analogize Stokes's murder to the "so-called I–35 murder," in which a "widow and her one-time boyfriend have been indicted for murdering her husband." The report then commences with Gasparoli's description of Dennis Stokes's murder, narrated while the camera moves slowly down an interior hallway of the Stokes's home. Immediately thereafter, Johnson appears on camera to make his statements regarding Terri Stokes. Johnson is then given the opportunity to analyze a carefully edited portion of his earlier interrogation of Terri Stokes. Although the report subsequently broadcasts Terri Stokes's denials, they come in the context of a hidden-camera confrontation between her and her mother-in-law, Joyce Stokes. Captured by her mother-in-law and the WCCO camera, Terri Stokes must deny the homicide even as she tries to explain an extramarital relationship. Joyce Stokes is then allowed to express her frustration with Terri separately to the camera. In this context, Gasparoli's closing comment that there is "no proof [Terri Stokes] had any involvement in the murder of her husband" offers only a weak counterbalance to the earlier assertions. Indeed, even these comments are spoken over an ominous approaching exterior shot of the Stokes's house that cuts quickly to a grainy videotape shot of Terri Stokes.

The American Journal report unfolds somewhat differently, but, once again, its literary context increases rather than diminishes the defamatory impact of Johnson's statements. Host Nancy Glass introduces the report by making it clear that Terri Stokes is the only suspect in her husband's death, although she also states that the police have no evidence. Reporter Lauren Thierry then commences with comments from Dennis Stokes's baffled co-workers. Quickly thereafter, however, the report builds its case against Terri Stokes. First, it introduces

Johnson's accusatory statements. Like the WCCO report, the American Journal report then employs the mother-in-law, Joyce Stokes, to ambush Terri Stokes, this time at her new home in Idaho. When Terri Stokes reacts by rushing into the house, Thierry suggests that there must be some "reason why" she is avoiding her mother-in-law. The report climaxes with Joyce Stokes's statement—made in response to Thierry's leading question—that she is one hundred percent sure that Terri killed her son. This statement is quickly underscored by the statement of Terri's brother, Steve O'Brien, who states that he also suspects Terri's involvement. In this context, Thierry's caveat that Terri Stokes has denied her guilt does little to dull the sting of the other assertions.

## 2. Falsity

■ Defendants contend that even if their disputed statements are capable of being proven false, Stokes has not produced evidence of their actual falsity sufficient to survive summary judgment. In support of this argument, defendants rely on *Moody v. St. Charles County*, 23 F.3d 1410 (8th Cir.1994). In *Moody*, the plaintiff brought a § 1983 action arising from his earlier arrest on drug charges by an undercover police officer. The plaintiff claimed that the officer had lied about the plaintiff's drug dealing in obtaining an arrest warrant. In resisting the defendant's summary judgment motion, however, plaintiff offered only his "own naked assertions that he did not sell drugs" in response to the officer's sworn affidavit. Furthermore, deposition testimony by the plaintiff's own witnesses, whom the officer had also named as parties to the drug transaction, was notably silent on the critical issue of whether the plaintiff had in fact not sold drugs. On the evidentiary record in before it, the *Moody* court held that summary judgment was appropriate.

Unlike *Moody*, however, the present case is not "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Stokes has offered much more than "naked assertions" that she did not kill her husband.

Most important, she has offered substantial evidence that she was not at the crime scene at times closely before and closely after the time of the killing. Further, the defendants have not offered direct evidence that Stokes committed the crime. In *Moody*, the sworn affidavit of an eyewitness police officer supported the disputed arrest. In the present case, the defendants possess only circumstantial evidence that Stokes killed her husband—circumstantial evidence considered too tenuous to support Stokes's arrest for homicide. Indeed, as Stokes points out, some of the evidence offered by the *defendants* is easily subject to interpretations favorable to Stokes. In short, "the moving parties' submissions [have] not foreclosed the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances'" that the defendants' assertions were false. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (1986) (citations omitted). Thus, summary judgment based on the issue of falsity is not appropriate.

## 3. Damage to Reputation

■ In *Richie v. Paramount Pictures Corp.*, the Minnesota Supreme Court held that

> absent allegations of actual malice, in order to survive a summary judgment motion in a defamation action concerning statements made by the media and involving a matter of public concern, there must be a genuine issue of material fact as to whether [the plaintiff] suffered actual harm; damages cannot be presumed.

544 N.W.2d 21, 26 (Minn.1996).

Further, the court stated that private defendants "utiliz[ing] the media" were subject to the same rule. Defendants argue that Stokes has failed to produce any proof that her reputation was damaged by the defendants' communications and, therefore, under the rule of *Richie*, summary judgment on her defamation claim is appropriate. The court disagrees, however, that Stokes has failed to show that Johnson and the WCCO broadcast actually damaged her reputation. Deposition testimony by Kaye Weise and Richard O'Brien directly addresses the issue of reputational harm caused by the WCCO broad-

cast, the centerpiece of which was Johnson's allegedly defamatory communication. Weise, in particular, points to specific events and remarks circumstantially demonstrating the harm caused by the WCCO report. *See M.F. Patterson Dental Supply Co. v. Wadley,* 401 F.2d 167, 172 (10th Cir.1968) (holding that evidence of out-of-court declarations may be introduced to show damage to plaintiff's reputation). Further, Stokes has testified to significant disruptions in her work and personal relationships that may evidence reputational damage. Taken as a whole, this evidence is far more substantial than the plaintiffs' showing in *Richie. See* 544 N.W.2d at 26 (deeming inquiries from friends and family and inchoate feelings of being snubbed insufficient to prove actual harm).

■ In contrast, Stokes has not made any specific showing that the American Journal broadcast injured her reputation. Nothing in the record indicates that this report specifically and adversely affected another person's opinion of her. Thus, Stokes has not demonstrated a genuine issue of fact as to the actual harm cause by the King World defendant. Nonetheless, as the court will shortly discuss, a genuine issue of fact exists as to whether the American Journal story was reported with actual malice. Accordingly, because *Richie* makes an exception for actual malice cases, the defamation claim against King World may proceed on the presumption that the American Journal report harmed Stokes's reputation.

## C. Malice

The question of malice will affect the disposition of many of the remaining issues in the case. The court will therefore address it as a separate topic, discussing each defendant in turn.

### 1. Deputy Johnson
#### a. Common Law Malice

■ If Johnson acted with common law malice, then qualified privilege will be unavailable to him. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 257 (Minn. 1980). To prove that a non-media defendant acted with malice, a defamation plaintiff must show "actual ill-will or a design causelessly

and wantonly to injure plaintiff." *Bol v. Cole,* 561 N.W.2d 143, 149 (Minn.1997) (citation omitted). Malice is a fact question, although the court must fulfill its role of weighing the sufficiency of the evidence. *See id.* Malice can be proven by extrinsic evidence or by intrinsic evidence, which may include "the exaggerated language of the libel, the character of the language used, the mode and extent of publication." *Frankson v. Design Space Int'l,* 394 N.W.2d 140, 144 (Minn.1986).

■ A number of intrinsic factors lead the court to conclude that the issue of Johnson's malice should be left for the jury. The court has already analyzed the inflammatory assertions made by Johnson: On two separate occasions, Johnson stated that he thinks Terry Stokes killed her husband, painting the crime in sensationalistic terms like "methodical execution" and "crime of passion." Moreover, Johnson made his statements to the accompaniment of his videotaped interrogation of Stokes, a dramatic device greatly in excess of his purported goal to obtain more information about the crime. Lastly, Johnson published his statements in the widest possible way, via local and national television. These factors, along with substantial extrinsic evidence of the single-minded way Johnson carried out his investigation of Stokes, make summary judgment on the issue of Johnson's common law malice inappropriate.

#### b. Malice in the Official Immunity Context

■ If Johnson acted with the kind of legal malice specific to the doctrine of official immunity, then official immunity will not be available to him. The Minnesota Court of Appeals recently articulated a framework for analyzing such claims of malice:

Immunity for the discretionary act applies when the official demonstrates: (1) that the conduct was "objectively" legally reasonable, that is, legally justified under the circumstances; (2) that the conduct was "subjectively" reasonable, that is, taken with subjective good faith; or (3) that the right allegedly violated was not clearly es-

tablished, that is, that there was no basis for knowing the conduct would violate the plaintiff's rights.

*Gleason v. Metropolitan Council Transit Operations,* 563 N.W.2d 309, 318 (Minn.Ct.App. 1997), *aff'd in part,* 582 N.W.2d 216 (Minn. 1998). Although a requirement of ill will is not required to negate official immunity, an "allegation of [ill will] may support the court's determination that the official's conduct was not legally reasonable." *Id.* 563 N.W.2d at 318 n. 3.

The court concludes that reasonable jury might find that Johnson's actions evidence the kind of malice that would negate official immunity. *See Rico v. State,* 472 N.W.2d 100, 107 (Minn.1991). First, several elements of Johnson's actions could be considered legally unreasonable: (1) his decision to focus solely on Stokes in his statements, despite a paucity of evidence; (2) his prosecutorial manner of describing her involvement; (3) the mode and extent of his publication. Second, these same elements provide substantial evidence that Johnson acted with subjective bad faith. Third, Stokes's right not to be defamed is clearly established in Minnesota law.

### c. Actual Malice

 Finally, if Johnson acted with actual malice, then the plaintiff may presume damages and may recover punitive damages. *See Richie,* 544 N.W.2d at 26 n. 5 (Minn. 1996) (on issue of damages, private parties "utiliz[ing] the television media" are placed "in the same legal position" as media defendants). To prove actual malice, a defamation plaintiff must show by clear and convincing evidence that the defendant made defamatory statements either knowing the statements were false or acting recklessly with regard to whether the statements were true. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A plaintiff is entitled to prove actual malice by circumstantial evidence. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). The question of whether the evidence in the record in a defamation case can support a finding of actual malice is a question for the court. *See id.* 491 U.S. at

687, 109 S.Ct. 2678. Although actual malice "focus[es] on the defendant's attitude toward the truth of what he has said rather than on his attitude toward the plaintiff," *Stuempges,* 297 N.W.2d at 258, a showing of ill will "is nevertheless relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity," *Cochran v. Indianapolis Newspapers,* 175 Ind.App. 548, 372 N.E.2d 1211, 1220 (1978).

 In addition to producing evidence of Johnson's personal animus, Stokes has shown that Johnson may have rushed to judgment in this case, allowing his conclusion about Stokes's guilt to set the agenda for his investigation. Material in the record suggests that Johnson dismissed plausible alternative theories, failed to ask pivotal questions of key figures, declined to pursue promising leads, and ignored potentially exculpatory evidence. Indeed, Johnson himself has repeatedly stated that his investigation focused on developing and gathering evidence against Stokes. Thus, if the jury finds that Johnson has falsely asserted that Stokes killed her husband, ample evidence exists to allow the jury to determine whether Johnson spoke with reckless disregard of the statement's falsity.

### d. Media Defendants

 If the media defendants acted with actual malice, then presumed and punitive damages are available to the plaintiff. Further, a finding of malice would obviate the necessity of finding a lesser degree fault under the requirements of *Gertz* and *Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476, 491 (Minn.1985) (plaintiff must establish that "the defendant knew or in the exercise of reasonable care should have known that the defamatory statement was false"). Again, to prove actual malice, a plaintiff must clearly show that the defendant published a statement with either knowledge or reckless disregard of a statement's falsity.

 In the present case, the plaintiff has produced evidence that both media defendants carried out only perfunctory investigations, largely adopting Johnson's view of the case as their own. Gasparoli, the WCCO

reporter, does not remember asking what information the police possessed to support their suspicions of Stokes, including critical inquiries as to whether polygraphs had been taken and whether insurance money was at stake. Further, Gasparoli does not remember asking why, if Johnson was so sure Stokes had killed her husband, he had not already arrested her. Thierry, the American Journal reporter, states that she relied on sources other than Johnson. For example, she interviewed both Joyce Stokes, Terri's mother-in-law, and Steve O'Brien, Terri's brother. However, like Gasparoli, Thierry took each source's emotional assertions at face value, without checking their factual bases. Likewise, Thierry never asked Johnson pivotal questions as to why Johnson should be so certain of Stokes's guilt after accumulating so little evidence over so long a period of time.

■ Evidence of a negligent media investigation cannot by itself meet the threshold of actual malice. *See Harte–Hanks Communications*, 491 U.S. at 688, 109 S.Ct. 2678, 105 L.Ed.2d 562. However, "reliance on the reports of others does not automatically shield one from liability." *Schultz v. Reader's Digest*, 468 F.Supp. 551, 565 (E.D.Mich. 1979). Indeed, in this case, a number of additional factors support a reasonable jury finding that the media defendants clearly acted with actual malice.

First, neither media defendant was operating under the kind of time-sensitive deadline that might explain the failure to verify the factual basis of its report. *See Washington Post v. Keogh*, 365 F.2d 965, 972 (D.C.Cir. 1966) ("In many instances considerations of time and distance make verification impossible.").

Second, as the Supreme Court held in *Harte–Hanks Communications*, 491 U.S. at 692–93, 109 S.Ct. 2678, 105 L.Ed.2d 562, "evidence of an intent to avoid the truth" by the media can satisfy the actual malice standard. In the present case, the fact that the WCCO and American Journal reporters chose not to ask Johnson critical questions about his investigation demonstrates that they might well have been afraid of what the answers would be.

■ Third, there were several compelling reasons for the media defendants to doubt Johnson's credibility. When a media defendant repeats the allegations of a third party, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of the report." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Alioto v. Cowles Communications, Inc.*, 430 F.Supp. 1363, 1370 (N.D.Cal.1977) (where the source for an article is not credible, failure to corroborate is probative of actual malice); *Mahnke v. Northwest Publications, Inc.*, 280 Minn. 328, 160 N.W.2d 1, 8 (1968) (affirming jury verdict that media defendant acted with actual malice by relying on dubious information). This is especially the case when the story· is "not 'hot news' and is [published] despite warnings to its author concerning its falsity." *See Stevens v. Sun Publishing Co.*, 270 S.C. 65, 240 S.E.2d 812, 815 (1978). Both WCCO and American Journal knew that Johnson had investigated the murder for months without making an arrest, knew that Stokes denied involvement, knew that she complained of Johnson's irrational obsession, and knew or should have known that the extremity of Johnson's assertions far outpaced his evidentiary foundation. Indeed, during the WCCO report, Gasparoli himself found it necessary to caution Johnson that a person is innocent until proven guilty and later suggested that Johnson's allegations sprang from "gut feelings." A reasonable jury might find these facts clearly probative of actual malice on the part of the media defendants.

Finally, in combination with these other factors, the highly slanted perspective of each report would further support a finding of actual malice. *See Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir.1982) (a preconceived story line may evidence reckless disregard of truth); *Westmoreland v. CBS, Inc.*, 596 F.Supp. 1170 (S.D.N.Y.1984) (bias in the editing of a story); *Jenoff v. Hearst Corp.*, 453 F.Supp. 541, 549 (D.Md. 1978), *aff'd*, 644 F.2d 1004 (4th Cir.1981) (hostile reporting). In fact, as the court has already discussed, the broadcasts' one-sidedness goes beyond merely favoring one party's

version of events over another. Through the use of ambush tactics and distorting visual and editorial techniques, both reports actively contributed to the impression that Stokes committed the crime.

For the foregoing reasons, Chief Justice Warren's admonition in *Curtis Publishing Co. v. Butts* seems especially apt in this case: "Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." 388 U.S. 130, 169–70, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (concurring). Based on the current evidentiary record, the court concludes that a reasonable jury could find that the media defendants in this case clearly acted with actual malice.[4]

## D. Defendants' Privilege and Immunity Arguments

### 1. Absolute Privilege

■ Defendants contend that under the doctrine of absolute privilege Johnson is immune from defamation liability, even if his statements were made maliciously. In support of the argument that absolute privilege attaches in this case, defendants rely on two Minnesota cases extending the doctrine to specific categories of statements made by executive officers. In *Carradine v. State*, 511 N.W.2d 733 (Minn.1994), the state supreme court held that statements made by an officer in a police report about an arrestee

were absolutely privileged. Subsequently, in *Buchanan v. Minnesota State Dep't of Health,* 573 N.W.2d 733 (Minn.Ct.App.1998), the court of appeals held that remarks made to the media by a Department of Health official regarding the conduct of a home health provider were absolutely privileged. The court based its holding on the fact that speaking to the media was part of the health official's assigned duties and "the public interest was served by permitting her to speak freely about this matter." *Id.* 573 N.W.2d at 737.

The court disagrees, however, that these cases dictate the conclusion that Johnson's statements are absolutely privileged. As the Minnesota Supreme Court has stated, "For absolute privilege to apply, the public interest served must be one of paramount importance, such that it is entitled to protection even at the expense of failing to compensate harm to the defamed person's reputation." *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn.1997). Indeed, the importance of carefully balancing public interest and individual harm was demonstrated by the *Carradine* court itself, which distinguished statements made in an officer's arrest report from direct statements made by an officer to the press:

An arresting officer's freedom of expression in making an arrest report is essential to the performance of his function as an officer, whereas it is not at all essential to

---

4. The court's determination that the plaintiff has produced evidence sufficient to meet the actual malice standard obviates the question of whether the media defendants broadcast the disputed statements with a lesser degree of fault.

Regardless, concerning the issue of media fault, the court finds the defendants' reliance on *Brown v. Hearst Corp.*, 54 F.3d 21 (1st Cir.1995), inappropriate. In *Brown*, a local television station broadcast a news report suggesting that an airline pilot had murdered his wife. The court held that the plaintiff could point "to nothing to suggest that [the television station] was negligent in the mustering of the available evidence." *Id.* 54 F.3d at 26. The television station had "conducted a substantial amount of research and a number of interviews in preparing the broadcast." This independent media research uncovered "substantial circumstantial evidence" supporting the claim that the pilot had indeed killed his wife, *id.* 54 F.3d at 23, including (1) the previous finding by a court that the pilot had abused his wife and threatened to kill her; (2)

the statement by a family friend that the wife had, shortly before her disappearance, called to say "if I'm not here by then, Willis will have done to me what he's promised to do to me"; (3) alleged claims by the children in the family that they had seen their father strangle their mother; (4) the fact that the pilot first agreed and thereafter refused to take a lie detector test. *Id.* 54 F.3d at 23–24. The *Brown* court also observed that the plaintiff could not "point to any counterbalancing exculpatory evidence that [the television station] wrongly withheld or that it would have discovered by diligent research." *Id.* 54 F.3d at 26. By comparison, the WCCO and American Journal reports were based on superficial research and highly debatable circumstantial evidence. Moreover, in both reports, potentially exculpatory evidence was either ignored, overlooked, or editorially minimized. Consequently, rather than refuting the argument that the media defendants in this case acted with a significant degree of fault, *Brown* supports it.

the officer's performance of his duties as an officer that he respond to press inquiries about the circumstances leading up to his arrest. . . . Since we must presume on this record that responding to press inquires was not one of the officer's duties and because of the greater risk of publication to a large number of people that accompanies the making of a public statements about the arrestee, we conclude that not all statements made to the press by an arresting officer . . . are absolutely privileged.

511 N.W.2d at 737.

The *Carradine* court found that the risk of allowing an officer to speak freely to the media about matters outside the four corners of a police report, when that officer is not required to do so, outweighs any public interest that might be served.

Likewise, the balance of public and private interests in the present case does not support a finding of absolute privilege. Although defendants attempt to distinguish this case from *Carradine* on the ground that Johnson was explicitly granted permission to speak with the media, the *Carradine* court reached its holding even in light of "evidence that statements to the media by state troopers are 'allowed' by state patrol policy." *Id.* Moreover, several factors unique to the present case strengthen the argument against an absolute privilege. First, unlike the statements at issue in *Carradine,* Johnson's statements pertained to an *unarrested* suspect in an ongoing investigation. Second, Johnson's mode of communication in this case posed more than a "risk of publication to a large number of people," a primary concern of the *Carradine* court. *See also Bol,* 561 N.W.2d at 149 ("Affording psychologists an absolute privilege with respect to statements contained in patient records concerning third parties . . . would increase the risk of publication to inappropriate persons."). In fact, Johnson's active participation in the preparation of the two broadcasts *guaranteed* publication to a potentially vast television audience.

This analysis is consistent with *Buchanan.* In *Buchanan,* the defendant official's statement conveyed information narrowly relating to an administrative proceeding, a matter of official record. The *Buchanan* court's finding of absolute privilege on these facts closely tracks the observation in *Carradine* that when an official's "statements to the press merely amount[ ] to an exact replication or a substantial repetition, without amplification or comment, of the statements made in [an official] report, . . . the statements to the press may not support liability." 511 N.W.2d at 737. Unlike the narrow statement at issue in *Buchanan,* however, Johnson's statements involve precisely the kind of "amplification and comment" that the *Carradine* court cautioned against.

For these reasons, the court declines to extend the doctrine of absolute privilege to all statements made by a police officer—no matter how defamatory or malicious, no matter how limited the public interest—when speaking to the media is part of the officer's duties. To do so would run counter to the well-established principle that "the doctrine of absolute privilege should be 'confined within narrow limits.'" *Bol,* 561 N.W.2d at 149 (quoting *Matthis v. Kennedy,* 243 Minn. 219, 67 N.W.2d 413, 417 (1954).

### 2. Qualified Privilege

■ Defendants also contend that Johnson's statements are qualifiedly privileged. For a defamatory statement to fall within the sphere of qualified privilege the statement "must be made upon a proper occasion, from a proper motive, and must be based on reasonable or probable cause." *Stuempges,* 297 N.W.2d at 256–57 (citation omitted). Even when these criteria are met, if the plaintiff proves the defamatory statement was made with malice, the privilege will not apply. *See id.* Whether a qualified privilege exists is a question of law for the court. *See Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 889 (1996).

■ As the court earlier determined, Stokes has made a sufficient showing that Johnson's statements evince malice. In any event, the court concludes that, when considered together in context, the occasion, the motivation, and the cause underlying Johnson's statements were improper. Regarding

the occasion of Johnson's assertions, Minnesota courts have frequently observed that any statement by a government official made to the media runs the risk of excessive publication. *See Bol,* 561 N.W.2d at 149; *Carradine,* 511 N.W.2d at 736. When the motivation behind the official's statements is to uncover information against a specific criminal suspect, use of the media becomes increasingly risky. And when there is a substantial question as to whether the official possesses reasonable or probable cause—and, in fact, the insufficiency of supporting information is a rationale behind the communication—that official's use of the media becomes untenably dangerous. Therefore, the court concludes that Johnson's statements are not protected by qualified immunity.

### 3. Official Immunity

The defendants also argue that Johnson should be protected by official immunity. The doctrine of official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of discretion unless the official is guilty of a wilful or malicious wrong." *Rico v. State,* 472 N.W.2d 100, 106–07 (Minn.1991). The doctrine was created to prevent "timidity [by public employees] in situations which ... require assertive control." *Watson v. Metropolitan Transit Comm'n,* 553 N.W.2d 406, 414 (Minn.1996). To this end, the discretion protected by official immunity must involve "something more than the performance of 'ministerial' duties." *Pletan v. Gaines,* 494 N.W.2d 38, 44 (Minn.1992). A duty is defined as ministerial when it is involves the "execution of a specific duty arising from fixed and designated facts." *Cook v. Trovatten,* 200 Minn. 221, 274 N.W. 165, 167 (1937) (citation omitted).

■ The court has already determined that Johnson's malice is properly a question for the jury. Nonetheless, the court also concludes that official immunity would be inappropriate in this case. In his role as

spokesman, Johnson's duties did not extend beyond the execution of a specific task arising from a fixed set of facts. Under the sheriff department's carefully defined policy, Johnson's narrow task was to update the media, in a factual and impartial manner, on the progress of the Stokes murder investigation. *See, e.g.,* Anoka County Sheriff's Department Manual at ACA–3032 ("Upon order of a superior officer, Members shall truthfully answer all questions specifically directed and narrowly related to the scope of employment"); *id.* at ACA–3048 ("Member shall truthfully, completely and impartially report ... evidence, including exculpatory evidence, in all matters of an official nature"). Johnson's duties as media spokesman did not require near the level of independent judgment found in Minnesota cases where official immunity has been held to apply. *See, e.g., Elwood v. Rice County,* 423 N.W.2d 671, 678–79 (police officers in emergency situations); *Watson,* 553 N.W.2d at 414 (bus drivers in emergency situations); *Olson v. Ramsey County,* 509 N.W.2d 368 (Minn.1993) (social worker's formulation of a case plan). Thus, because he performed only ministerial duties when speaking with the media, Johnson is not shielded by official immunity.[5]

### 4. Fair Report Privilege

■ The media defendants argue that the fair report privilege protects them from suit. In defamation actions, media defendants possess a qualified privilege when making a fair and accurate report of public records or proceedings. *See Michaelis v. CBS, Inc.,* 119 F.3d 697, 701 (8th Cir.1997); *Jadwin,* 390 N.W.2d at 441. In this case, however, the media defendants did much more than reiterate or summarize official documents or proceedings. They broadcast Johnson's allegedly defamatory statements, statements nowhere to be found in any public record. *See also Brown,* 54 F.3d at 24 (even where a television news report's information is drawn from official proceedings, "where the evi-

5. Although Johnson's actions do not fall within the ambit of official immunity, they were clearly carried out within the scope of his employment with the Anoka County Sheriff's Department. Anoka County may therefore be held liable for Johnson's allegedly tortious activity under the doctrine of respondeat superior. *See* Minn.Stat. § 466.02; *Westby v. Itasca County,* 290 N.W.2d 437, 438 (Minn.1980).

dence is enlarged and the charge cast in a more lurid light, it is not clear to us that the fair report privilege automatically shields the larger whole"). Consequently, the fair report privilege does not attach to the media defendants in this case.

## CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that defendants' motions for summary judgment be denied.