**Frances KOVATOVICH, Plaintiff,**

v.

**K–MART CORPORATION, Defendant.**

**No. 98–1615 RLE.**

United States District Court,
D. Minnesota.

Dec. 29, 1999.

R. Thomas Torgerson, Duluth, MN, for Plaintiff.

Matthew E. Klein, Minneapolis, MN, for Defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b)(1)(C), upon the Motion of the Defendant for Partial Summary Judgment. A Hearing on the Motion was conducted on September 23, 1999, at which time the Plaintiff appeared by R. Thomas Torgerson, Esq., and the Defendant appeared by Matthew E. Klein, Esq.

For reasons which follow, we grant the Defendant's Motion for Partial Summary Judgment in part.

### II. *Factual and Procedural History*

The Plaintiff, a 46–year old female pharmacist, began work as a K–Mart pharmacy manager in Virginia, Minnesota, in 1990. In February of 1998, the Plaintiff was terminated from her position at K-mart for an alleged breach of patient confidentiality. See, *Defendant Ex. 4.* While employed, the Plaintiff was subject to the supervision and evaluation by the store manager, Michael Brown ("Brown"). See, *Deposition of Mi-*

*chael Brown*, at 14–17. Additionally, the Plaintiff was subject to the direct supervision of the K–Mart district pharmacy manager, who traveled between stores located throughout the area. See, *Deposition of Brett McCabe*, at 5–8. The last such manager, with whom the Plaintiff dealt, was Brett McCabe ("McCabe"). *Id.*

The basis for the Plaintiff's discharge revolves around a sequence of events which led to the Plaintiff's disclosure, to a third party, of the attempts of Linda Frame ("Frame"), who is a K–Mart Human Resource Manager, to become pregnant through artificial insemination. See, *Deposition of Linda Frame*, at 24–25. Around the time of the Plaintiff's disclosure, Frame discussed, with several fellow K-mart employees, and close friends, her attempts to become pregnant. *Id.* at 15–16, 25–26. Frame also disclosed her plan to employ artificial insemination with these same individuals. See, *Deposition of Heidi Schley*, at 10–13. Apparently, Frame discussed these plans with a variety of friends and coworkers, at K–Mart, and in public. At no time, had Frame requested that the information be kept confidential. *Id.* at 14–15.

One person, with whom Frame discussed her plans, was Heidi Schley ("Schley"), who also was employed by K–Mart. Subsequently, in January of 1997, Schley paid a social visit to Kovatovich at her home. During the ensuing conversation, Schley disclosed to the Plaintiff Frame's plan to employ artificial insemination to become pregnant. See, *Schley Dep.* at 15–17; *Deposition of Frances Kovatovich*, at 69–75. Further, according to the Plaintiff, Schley did not tell her that this information was confidential, or that she should keep it confidential. See, *Schley Dep.* at 16; *Kovatovich Dep.* at 70.

On February 8, 1997, the Plaintiff wrote a letter to former K–Mart employee, Phyllis Lange ("Lange"). See, *Kovatovich Dep.* at 69–70. In the letter, the Plaintiff wrote, "Loon (a nickname for Frame) is going to have artificial insemination sometime this month and with any luck at all

she will be on leave for Christmas." See, *Schley Dep.* at 7.

Two months *later*, Frame filled a prescription at the K–Mart pharmacy for the fertility drug Clomid. See, *McCabe Dep.* at 93–94; *Frame Dep.* at 30–32. According to the Plaintiff, the drug Clomid has multiple uses, one of which is as a fertility drug. See, *Plaintiff's Memorandum in Support*, at 3. However, the Plaintiff contends that the use of Clomid alone would fail to disclose, to a pharmacist, that a user was undergoing an artificial insemination procedure. *Id.; Deposition of Brian Leach*, at 71; *McCabe Dep.* at 94.

Subsequently, in the Summer of 1997, K–Mart employee Donna Wiirre ("Wiirre") was told by Lange, during a telephone conversation, that the Plaintiff had informed her that Frame was attempting to become pregnant. See, *Deposition of Donna Wiirre*, at 13–16. Later in the Summer, Wiirre conveyed this information to Frame. See, *Frame Dep.* at 38–39.

In August of 1997, K–Mart promoted McCabe to the position of District Pharmacy Manager. See, *McCabe Dep.* at 6–8. In October, McCabe met with pharmacist Brian Leach ("Leach") at the Virginia K–Mart store. During their conversation, Leach informed McCabe that, because he did not get along with Kovatovich, he wanted a transfer. See, *Leach Dep.* at 38–40. Subsequently, on Leach's final day of work, Frame informed Leach of the Plaintiff's letter to Lange. *Id.* at 46–51.

On that same date, the Plaintiff and Leach engaged in a heated verbal confrontation. See, *Kovatovich Dep.* at 51–52. As expressed by the Plaintiff, Leach was slovenly, lazy, and generally incompetent. *Id.* at 117–120. After the pharmacy closed, the Plaintiff followed Leach to the front of the store, where she told him that, in her opinion, a pharmacy technician had performed Leach's job for him and, therefore, a gift from Leach to the pharmacy technician would be appropriate. *Id.* at 51–52; *Leach Dep.* at 41–46. This statement led to the confrontation between the

Plaintiff and Leach. *Id.* As a result of this incident, the Plaintiff was disciplined, at the direction of McCabe. See, *McCabe Dep.* at 30–31.

The Plaintiff's letter to Lange did not come to the attention of McCabe until February of 1998. *Id.* at 62. Around this time, McCabe and Leach had a conversation at the Duluth K–Mart store, during which Leach complained to McCabe about the behavior of the Plaintiff during his last day of work at the Virginia K–Mart. See, *Leach Dep.* at 59–65. At this time, Leach also informed McCabe that Frame had disclosed the Plaintiff's letter to Lange to him, in which she discussed the attempts of Frame to become pregnant. See, *McCabe Dep.* at 62–64. Two days later, McCabe made the decision to terminate the Plaintiff, based on a perceived breach of patient confidentiality.

Prior to the termination of the Plaintiff, McCabe conducted an investigation so as to verify the allegations made against her. Initially, McCabe contacted Frame, who verified the information that she had learned from Wiirre; namely, that the Plaintiff had written a letter to Lange, in which Frame's plans for pregnancy were mentioned. *Id.* at 65–67. McCabe also contacted Brown, who confirmed that Frame had discussed her concerns with him. *Id.* at 81. Additionally, McCabe spoke with Wiirre, who also confirmed the facts surrounding the Plaintiff's letter to Lange. *Id.* at 83–84. Subsequently, after consulting with Howard Kramer, who is K–Mart's Director of Pharmacy Operations, McCabe concluded that a breach of patient confidentiality had occurred, and consequently, he made the decision to terminate the Plaintiff's employment. *Id.* at 86.

On February 16, 1998, McCabe traveled to the Virginia K–Mart store in order to discharge the Plaintiff. *Id.* at 89. During their meeting, the Plaintiff did not deny writing the letter to Lange but, instead, defended her actions by stating that she never mentioned Frame's drug therapy, and obtained the information regarding Frame's plans for pregnancy through sources unrelated to Frame's prescription. See, *Kovatovich Dep.* at 70–73.

The Plaintiff argues that McCabe mistakenly assumed that she had received the information regarding Frame through her prescription. See, *Plaintiff's Memorandum in Opposition*, at 18–19. She also asserts that McCabe neglected to conduct an adequate investigation, through which he would have determined that the Plaintiff obtained the information regarding Frame from independent sources. *Id.* at 24. However, McCabe has testified that the Plaintiff would have been terminated, regardless of where she had obtained the information regarding Frame, because, in his view, the Plaintiff had breached her duty of patient confidentiality by discussing Frame's medical condition with Lange, no matter what the source of the information might be. See, *McCabe Dep.* at 58–60, 91–93. In response, the Plaintiff contends that neither K–Mart pharmacy policies, nor applicable law, support McCabe's interpretation of what constitutes a breach of client confidentiality. See, *Plaintiff's Memorandum in Opposition*, at 8.

Following the termination of the Plaintiff's employment, it is alleged that individuals, who were in no way involved with the hiring or firing of pharmacists, were informed of the reason for the Plaintiff's discharge. *Id.* at 9. The Plaintiff notes that a variety of people were told of her discharge, including Frame, store pharmacist Amy Warner ("Warner"), and Leach. See, *McCabe Dep.* at 99; *Leach Dep.* at 54–55. Also, Judy Ricker ("Ricker"), who is K–Mart's Domestics Manager, told a third party, Brenda Bentz ("Bentz"), the details of the Plaintiff's discharge. See, *Bentz Aff.*

About a month after the Plaintiff's termination from employment, the Defendant distributed several form letters, as part of a targeted mailing program, to its pharmacy customers. See, *Defendant's Responses to Interrogatories, Response No. 12.* These letters were sent on K–Mart letter-

head, and bore the Plaintiff's name—as the purported author of the correspondence—thereby suggesting that she had retained her position as a local pharmacy manager. See, *Brown Dep.* at 127–129; *Defendant's Exs. 13, 14, 25–27.* According to the Plaintiff, the Defendant used these letters to parlay the established, long-term relationships between its pharmacists, and their customers, into increased pharmacy sales. See, *Plaintiff's Memorandum in Support,* at 14. The letters distributed by the Defendant included comments that could be construed as business solicitations, such as: "Your health is important to us, so please come back in and see us." See, *Defendant's Exs. 13, 14, 25–27.* As such, the Plaintiff argues that the Defendant used these letters in order to capitalize on her name recognition, as many pharmacy customers frequent one pharmacy, over another, because of the pharmacists who work there. See, *Plaintiff's Memorandum in Support,* at 14; *McCabe Dep.* at 105; *Brown Dep.* at 126.

Based upon these facts, as well as several instances of alleged disparate treatment which we detail later, the Plaintiff commenced this action against the Defendant, asserting claims of (1) defamation; (2) age and sex discrimination under the Minnesota Human Rights Act ("MHRA"); (3) violation of the Equal Pay Act, based on age and sex discrimination; (4) appropriation of name and goodwill; (5) violations of Minnesota Statutes Sections 325D.44, 325F.67 and 325.69, and, (6) a failure to timely pay wages pursuant to Minnesota Statutes Section 181.13. The Defendant has responded with this Motion for Partial Summary Judgment, in which it seeks dismissal of all of the Plaintiff's claims, except that asserted under Section 181.13.

### III. Discussion

1. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determina-

tions. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. *Carter v. St. Louis Univ.,* 167 F.3d 398, 400 (8th Cir.1999); *Prudential Ins. Co. v. National Park Med. Center, Inc.,* 154 F.3d 812, 818 (8th Cir.1998). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Chism v. W.R. Grace & Co.,* 158 F.3d 988, 990 (8th Cir.1998). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir. 1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross*, 992 F.2d 162, 163 (8th Cir. 1993).

Lastly, "[b]ecause [employment] discrimination cases often turn on inferences rather than on direct evidence, [Courts] are particularly deferential to the non-moving party." *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996); see also, *Davis v. Fleming Companies*, 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West*, 47 F.3d 985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995). Nevertheless, while "summary judgment should seldom be granted in employment discrimination cases, if [the Plaintiff] fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir.1995); quoting *Weber v. American Express Co.*, 994 F.2d 513, 515–516 (8th Cir.1993); see also, *Wilson v. International Business Machines*, 62 F.3d 237, 240 (8th Cir.1995).

2. *Legal Analysis.*

a. *The Plaintiff's Discrimination Claims.* The Plaintiff's first claim involves alleged age and sex discrimination by the Defendant, in violation of the MHRA. The Plaintiff contends that she was subjected to age and sex discrimination prior to her termination and, further, that her termination came about as a result of age and sex discrimination. See, *Complaint*, ¶¶ 23–26.

i. *Standard of Review.* The MHRA prohibits employers from discriminating against their employees on the basis of either age or gender. See, *Minnesota Statutes Section 363.03, Subdivision 1(2)*. An employee, such as the Plaintiff, who alleges disparate treatment in her employment, may rely upon either direct or circumstantial evidence in order to sustain her claim. See, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing the framework for pretext cases that involve circumstantial evidence). Here, the Plaintiff relies exclusively upon circumstantial evidence to substantiate her claims. Therefore, we will apply the *McDonnell Douglas* analytical framework to her claims of discrimination.[1]

The premise of a pretext employment discrimination case "is that either a legitimate or illegitimate set of considerations led to the challenged decision." *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993), quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under the *McDonnell Douglas* framework, "the plaintiff creates an inference of intentional discrimination by establishing the so-called prima facie case." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995). "While its elements will vary depending on the circumstances of the case, the fundamental purpose of the prima facie case is to require the plaintiff to show: (1) that an adverse employment action occurred, and (2) that the most common explanations for an adverse employment action, such as incompetence, are not applicable." *Id.*

Once the plaintiff has made the required *prima facie* showing, the burden shifts to

---

**1.** Claims of discrimination, under the MHRA, are subjected to the same analysis as applicable under Title VII, inclusive of the burden-shifting regime enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, *Scott v. County of Ramsey*, 180 F.3d 913, 917 (8th Cir.1999); *DeRoche v. All American Bot-* *tling Corp.*, 57 F.Supp.2d 791, 795 (D.Minn. 1999); *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn.1999). Accordingly, while we cite Federal authorities in expressing the Standard of Review we employ, those authorities parallel the standards applicable under the MHRA.

the employer to articulate a legitimate non-discriminatory reason for its challenged decision. See, *McDonnell Douglas Corp. v. Green,* supra at 802, 93 S.Ct. 1817; *Texas Department of Comm. Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Hutson v. McDonnell Douglas Corp.,* supra at 777 ("Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action"). If the employer provides such a reason, then "the burden shifts back to the plaintiff to demonstrate that the reason provided was a pretext for discrimination." *Id.*

However, should the employer be unable to provide such a reason for its decision, then the employee is entitled to a finding of intentional discrimination. See, *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under this burden-shifting approach, the plaintiff retains the ultimate burden of persuasion on the issue of whether the employer's proffered reason is pre-textual, and whether the plaintiff has, in fact, been a victim of intentional discrimination. *Id.* at 506–12, 113 S.Ct. 2742; *Hasnudeen v. Onan Corp.,* 552 N.W.2d 555, 557 (Minn.1996)(construing the MHRA).

ii. *Legal Analysis.*

(1) *Termination Related Discrimination.* Here, the first two phases of the *McDonnell Douglas* analysis have been satisfied by the showings of the opposing parties. The Plaintiff has demonstrated facts which establish a *prima facie* case of discrimination with respect to the termination of her employment.[2] According to the Plaintiff, Schley, who is the 22–year old female pharmacy technician who originally told her of Frame's plan to use artificial insemination, was never investigated, nor disciplined, for the same acts which

resulted in the Plaintiff's dismissal, even though Schley was a K–Mart employee at the time that she disclosed the information to the Plaintiff, and continued to be a K–Mart employee, in Austin, Texas, following the Plaintiff's termination. See, *Schley Dep.* at 4–6, 22. Further, the Plaintiff avers that she was replaced by Warner, who was 24 years old, and by Bob Pullano ("Pullano"), a male pharmacist who is also younger than the Plaintiff. See, *Plaintiff's Memorandum in Support,* at 10; *McCabe Dep.* at 35. The Plaintiff also asserts that the Defendant discriminated against her by denying her the opportunity to participate in pharmacy staffing decisions which, in turn, resulted in adverse job evaluations, and lower pay.

At K–Mart, the performance reviews of persons with the Plaintiff's responsibilities are based, in part, on their ability to manage others. See, *McCabe Dep.* at 18–21, 36–43. In the Plaintiff's case, her performance reviews, and write-ups, consistently contained low scores, mainly because of her difficulties with the employees who were subject to her direct supervision. See, *Defendant Exs.* 8–10. According to the Plaintiff, she was denied major input in hiring, and in evaluating pharmacy technicians, which forced her to work with poor quality employees. See, *id.*

In response, the Defendant has articulated a legitimate, non-discriminatory reason for the Plaintiff's employment termination; namely, a perceived breach, by the Plaintiff, of her duty to preserve patient confidentiality. According to the Defendant, because the Plaintiff discussed Frame's plan, to employ artificial insemination, with Lange, her employment was properly terminated. The Plaintiff argues, however, that the "breach of confidentiality" justification, for her discharge, is a mere pretext for intentional age, and gender, discrimination. According to the

---

**2.** The Defendant has, for the purposes of this Motion, conceded that the Plaintiff has established a *prima facie* case of age and gender discrimination as to her employment termination, and only challenges her ability to show that its proffer of a legitimate business reason for her termination is a mere pretext for unlawful discrimination.

Plaintiff, the pretextual nature of the basis for her termination, is evidenced by the fact that McCabe, who believed he had reason to fire her, conducted a transparently thin investigation, whereas a thorough inquiry would have absolved her. See, *Plaintiff's Memorandum in Opposition*, at 24.

■ As the Plaintiff notes, McCabe decided that the Plaintiff had breached her duty of confidentiality without questioning her. See, *McCabe Dep.* at 58–59, 88–89. In addition, McCabe failed to investigate whether the Plaintiff had obtained the information, concerning Frame's plan for pregnancy, from a prescription, even after he was informed that a prescription was not the source of that information. *Id.* at 51–104. With a minimal amount of time and effort, McCabe could have competently explored whether the Plaintiff had obtained the asserted confidential information from her work at the pharmacy, or had secured information—plainly not confidential—from openly public sources. Instead, McCabe superficially questioned a few individuals, at least one of whom—Leach—had an historically strained relationship with the Plaintiff. On this showing, the Plaintiff contends that the "breach of confidentiality" explanation is a mere ruse for unlawful age and gender discrimination at the hands of the Defendant.

When, as we must, we view this showing in a light most favorable to the Plaintiff, we cannot conclude, as a matter of law, that the "breach of confidentiality" predicate for the Plaintiff's termination is not pretextual. In our view, a reasonable Jury, which is faced with the conflicting factual contentions of the parties—and the Defendant has not remained silent as to the propriety of McCabe's belief that the Plaintiff disclosed confidential information gleaned from her status as Frame's pharmacist—must resolve whether an age or gender animus, rather than a legitimate business reason, prompted the Plaintiff's discharge. Therefore, we find, on the Record submitted, that a genuine, and material, issue of fact precludes the entry of Summary Judgment, in the Defendant's favor, on this aspect of the Plaintiff's age and gender discrimination claims.

(2) *Pre-termination Discrimination.* As to her claim of pre-termination discrimination, the Plaintiff has satisfied, once again, her initial burden by identifying a variety of circumstances that could be construed as disparate treatment, based upon circumstances of her age and/or gender.

According to the Plaintiff, on one occasion, Brown chastised her for wearing shorts in violation of the dress code, while allowing Leach to wear "filthy, torn sweat pants." See, *Kovatovich Dep.* at 107–108. Also, as related by the Plaintiff, Brown made her obtain a doctor's prescription in order to wear tennis shoes at work while, on a contemporaneous basis, he waived the same requirement as to Leach. *Id.* at 181. Brown would not allow the Plaintiff to eat her lunch in the pharmacy, while he allowed Leach to do so. *Id.* at 108–109. Further, the Plaintiff avers that other male pharmacists were given enhanced lunch privileges, as compared to those which she had experienced. *Id.*

The Plaintiff also alleges that there were several instances in which complaints that were received by K–Mart, regarding Leach's performance, resulted in no disciplinary action, while similar occurrences, involving her, resulted in the imposition of oral, or written, disciplinary action. *Id.* at 97–98, 106–187. The Plaintiff recounts how Brown belittled her in front of pharmacy staff, while treating male pharmacists more preferably. *Id.* at 113–114. Further, the Plaintiff asserts that she was chastised for being late to work, while other, male pharmacists, were not. *Id.* at 114–115. Finally, the Plaintiff claims that she was discriminated against in terms of pay, because she was paid less than male, or younger pharmacists, who performed the same tasks as she did. See, *Plaintiff's Memorandum in Opposition*, at 12.

■ In response, the Defendant points out that, as the Plaintiff herself testified during her deposition, much of the behavior of Brown—the individual that the

Plaintiff has identified as the prime perpetrator of the pre-termination discrimination—would have been different if the Plaintiff had "kissed up" to him. See, *Kovatovich Dep.* at 114–115. In this respect, the Defendant cites the decision in *Montandon v. Farmland Indust., Inc.,* 116 F.3d 355 (8th Cir.1997), where a plaintiff's discrimination claim was rejected because she admitted that the decisive factor in her treatment was something other than her age or gender. See, *Defendant's Memorandum in Support,* at 11–12. However, the Plaintiff's deposition testimony, standing alone, does not equate her claims to those rejected by the Court in *Montandon.*

There, the plaintiff testified that sexual preference was *not* a factor in determining how employees were treated while, here, the Plaintiff never admitted that "kissing up" was the decisive factor in her treatment by Brown. *Id.* at 12–14. Rather, at her deposition, the Plaintiff only acknowledged that a factor in Brown's treatment of an employee was whether the employee "kissed up" to him. See, *Kovatovich Dep.* at 102–103, 114–115. We recognize that the Plaintiff has identified several people, who were treated favorably by Brown because they "kissed up" to him, even though they were females. *Id.* Nevertheless, we cannot say, as a matter of law, that a reasonable Jury could not reasonably infer, based upon all of the complaints of disparate treatment the Plaintiff has cited, that "kissing up" was a prerequisite for women to obtain favorable treatment from Brown, to a decisively greater extent than for males. On this Record, we cannot find that "kissing up" was gender neutral such

as would legally preclude the Plaintiff from complaining about the disparity she alleges in her treatment as opposed to others who do not bear her protected status. Consequently, the Plaintiff has raised a fact issue, which precludes the entry of summary Judgment, on this aspect of her age and gender discrimination claims.[3]

b. *The Equal Pay Act Claim.* In addition to her discrimination claims, the Plaintiff has asserted a claim under Minnesota's Equal Pay Act. See, *Minnesota Statutes Section 181.67.* According to the Plaintiff, male pharmacists in the Defendant's employ received more pay, for performing the same tasks, than the Plaintiff was paid. In pertinent part, the Equal Pay Act provides as follows:

> No employer shall discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate the employer pays to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to a seniority system, a merit system, a system which measures earning by quantity or quality of production, or a differential based on any factor other than sex.

*Minnesota Statutes Section 181.67, Subdivision 1.*

[5] As noted by the Defendant, the *McDonnell Douglas* analysis applies to Equal Pay Act claims as well. See, *Brekke v. City of Blackduck,* 984 F.Supp. 1209, 1224 (D.Minn.1997); *Kolstad v. Fairway*

---

**3.** We would add, however, that the survival of the Plaintiff's age and gender claims is, necessarily, a result of the analytical strictures of Summary Judgment, and not because the evidence of discrimination is compelling. The Record is devoid of the age or gender based comments which routinely support such discrimination claims, but is sufficient to surpass dismissal as a matter of law, but only marginally so. While we take no position as to the ultimate outcome of the Plaintiff's discrimination claims at Trial, we note that the Record is replete with evidence concerning the abrasive nature of the Plaintiff's workplace *perso-*

*na,* and she, herself, admits to having cordial relations with only four of the fifteen pharmacy technicians with whom she worked during her tenure in the Defendant's employ. See, *Kovatovich Dep., Vol. 2,* at 100–101. Under the regimen of Rule 56, we are obligated to view the evidence, in all of its particulars and inferences, in the Plaintiff's favor, a circumstance that will not attend the presentation of her claims at Trial. Whether the Plaintiff was treated differently because she was difficult to work and associate with, as opposed to because of her age or gender, we properly leave to a Jury's determination.

*Foods,* Inc., 457 N.W.2d 728, 734 (Minn. App.1990).

 Under Section 181.67, a plaintiff may establish a *prima facie* case with evidence of "an employer paying different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skills, effort and responsibility * * *." *Kolstad v. Fairway Foods, Inc.,* supra at 734; quoting *Danz v. Jones,* 263 N.W.2d 395, 400 (Minn.1978). Nevertheless, "[d]ifferences in wages are not unlawful in Minnesota if based on a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a wage differential based on any factor other than sex." *Kolstad v. Fairway Foods, Inc.,* supra. As a consequence, proof of any of these systems, or otherwise permissible differentials, will rebut the Plaintiff's *prima facie* case, and force her to show pretext. *Id.*

Here, the Plaintiff has satisfied her initial burden by producing evidence which demonstrates that her successor, who is a male, was paid more than her. Also, the Plaintiff has demonstrated that the Defendant paid higher wages to a male staff pharmacist, than were paid to her, in her position as a pharmacy manager. The Defendant responds by urging that such pay differences were partially a result of the Plaintiff's poor performance reviews. See, *McCabe Dep.* at 37–38. According to the Defendant, since it has articulated a legitimate, non-discriminatory reason for the alleged discrepancy in wages, the burden of production has now shifted back to the Plaintiff, so as to prove that this proffered reason is pretextual. See, *Defendant's Reply Memorandum,* at 6. We agree.

The Plaintiff has attempted to demonstrate pretext by arguing that she had received poor performance reviews as a result of the Defendant's acts of sexual discrimination. The Defendant rebuts this assertion by, once again, referencing the Plaintiff's testimony concerning an employee's need to "kiss up" to Brown. As a consequence, the same considerations, which led to our rejection of that argument, in the context of the claimed gender discrimination, produces the same result as to the Equal Pay Act claim. Simply put, the Plaintiff has not admitted, as the Defendant maintains, that Brown treated her poorly, solely because of her refusal to "kiss up." Rather, the Plaintiff has merely acknowledged that "kissing up" was simply one factor which could have alleviated some of the harsh treatment that she alleges to have received at Brown's instance.

As a result, the Plaintiff has raised a genuine issue of material fact on the question of her alleged gender influenced pay inequality, which precludes the entry of Summary Judgment.

 c. *Appropriation Claim.* As we have noted, after the Plaintiff's discharge, the Defendant employed her name on form letters which, according to the Plaintiff, implied that her name and goodwill belonged to the Defendant, so as to generate more business. The Defendant responds that the use of the Plaintiff's name was inadvertent and, therefore, that the Plaintiff's claim must be dismissed, as she has failed to proffer facts which demonstrate an intent, on the part of the Defendant, to appropriate the Plaintiff's business good will.[4]

4. In a footnote in its Memorandum of Law, the Defendant also seeks a dismissal of the Plaintiff's statutory claims under Minnesota Statutes Sections 325D.44, 325F.67, and 325F.69, on the basis that the Plaintiff, who does not purport to be a "consumer," has no standing to sue under provisions specifically intended to protect a consumer. The Plaintiff has pled these statutory means, as an alternative to her tort of "appropriation" claim, so as to obtain an Order "awarding [her] all available damages in an amount to be proven at trial, injunctive relief enjoining K–Mart from the unauthorized use of her name and good will, and her reasonable attorneys [sic] fees and costs." *Plaintiff's Complaint,* p. 8. We find the Defendant's Motion well-taken, in part.

As to the Plaintiff's claim, that the Defendant violated the provisions of Section 325D.44, Subdivision (1), (2), (3), (5), and (13), any such violation may be remedied as

█ The tort of "appropriation" protects an individual's identity, and is committed when one appropriates to his own use or benefit the name or likeness of another. See, *Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231 (Minn.1998); *Restatement (Second) of Torts* § 652C. In defining this cause of action, the Minnesota Supreme Court referenced the Restatement (Second) of Torts, § 652(c) (1977), which reads as follows:

> One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.

*Lake v. Wal–Mart Stores, Inc.*, supra at 233.

As explained by the Court of Appeals for the Fifth Circuit:

> Tortious liability for appropriation of a name or likeness is intended to protect the value of an individual's notoriety or skill. * * * [T]he appropriation tort does not protect one's name per se; rather, it protects the value associated with that name.

*Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir.1994).

The Defendant cites the Restatement in support of its assertion that appropriation is an intentional tort. The Plaintiff disagrees, and argues that, in the event that

intent is deemed to be an element of the tort of appropriation, she has established intent by highlighting those facts which demonstrate that the Defendant used her name, without her consent, thereby allowing one to reasonably infer that the appropriation was intended for the Defendant's commercial benefit.

A review of the Restatement's commentary, on the tort of appropriation, reveals a notable dearth of attention to the issue of intent. As the Plaintiff observes, the word "intent" does not appear anywhere in the Restatement, nor in the text of the *Lake* opinion. However, the Restatement, in a comment, states that the value of a plaintiff's name is not appropriated in the following circumstance:

> [W]hen it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity * * *. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness that the right to privacy is invaded.

See, *Restatement (Second) of Torts*, § 652C, comment (d).

To tortiously appropriate an individual's name, one must appropriate for the *pur-*

---

allowed by Section 325D.45, which allows injunctive relief, costs and, at least potentially, attorneys' fees. An action to enforce the prohibitions of Section 325.44, is not directly, or indirectly limited to consumers, and is not one of the statutory measures enumerated in the "private attorney general statute." See, *Minnesota Statutes Section 8.31, Subdivision 3a.* We read Section 325.45 as providing a remedy to "[a] person likely to be damaged by a deceptive trade practice of another," and Section 325D.44, Subdivision 2, makes clear that "a complainant need not prove competition between the parties." Nothing in the language of either Section would restrict the intended remedies to "consumers," although any claim that the Plaintiff may have under Section 325.44 would not allow for the recovery of damages. Otherwise, the Plaintiff's claim under Section 325D.44 appears to be viable.

With respect to the Plaintiff's claim under Sections 325F.67 and .69, we continue in the view that, since she is not a consumer, she has no protections under either statutory provision. See, *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 1998 WL 1056973 *47 (D.Minn., August 6, 1998), adopted as modified on other grounds, *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 34 F.Supp.2d 738 (D.Minn.1999); *Church of Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 7–8 and 9 (Minn.1992); *Cooperman v. R.G. Barry Corp.*, 775 F.Supp. 1211, 1213–14 (D.Minn.1991); *Tremco, Inc. v. Holman*, 1997 WL 423575 (Minn.App., July 29, 1997)(Unpublished), rev. denied (Minn., September 25, 1997); but see, *Kronebusch v. MVBA Harvestore System*, 488 N.W.2d 490, 494–95 (Minn. App.1992), rev. denied (Minn., October 20, 1992). Accordingly, the Plaintiff's claims under Sections 325F.67 and .69 are dismissed with prejudice.

*pose* of taking advantage of that individual's name, or reputation. It would seem axiomatic that an individual could not commit an act, *for a purpose,* without implicitly demonstrating an intent to accomplish that purpose.

While the tort of appropriation is relatively undeveloped in the law of Minnesota, a review of the decisions in foreign jurisdictions supports the proposition that the tort of appropriation requires intent. For example, in *Lineberry v. State Farm Fire & Casualty Co.,* 885 F.Supp. 1095, 1098 (M.D.Tenn.1995), the Court reasoned as follows:

> There are four kinds of invasion of rights to privacy: (1) appropriation; (2) unreasonable intrusion; (3) public disclosure of private facts; and (4) false light publicity. Restatement (Second) of Torts § 652A (1977). * * * Appropriation is committed by one who takes for his or her own use or benefit another's name or likeness without consent. *Id.* at § 652C. It is, therefore, an intentional tort, as an intentional act is required before one can be held liable for appropriation. Indeed, an action for appropriation may not stand where the defendant merely adopted a name that is the same as the plaintiff's, as "long as he does not pass himself off as the plaintiff or otherwise seek to obtain for himself the values or benefits of the plaintiff's name or identity." *Id.* at § 652C, comment (c). Likewise, the incidental use of plaintiff's name or likeness does not constitute appropriation. *Id.* at § 652C, comment (d).

In addition, those Courts, which have adopted the Restatement's definition of appropriation, have determined that an incidental use of a plaintiff's name or likeness is not actionable. See, *Matthews v. Wozencraft,* supra at 436 (holding that, under Texas law, appropriation claims cannot involve a defendant who appropriates a plaintiff's name in an incidental manner, or for a newsworthy purpose); *Foster v. Livingwell Midwest, Inc.,* 865 F.2d 257, 1988 WL 134497 at *2 (6th Cir., Dec. 16, 1988)(Table Decision)(holding that no lia-

bility attaches if the use or appropriation is incidental).

■ Here, the Defendant contends that the letters in question were distributed inadvertently, because it accidentally failed to send its mass mailing contractor, Elynsis, an updated list of its pharmacy managers. See, *Defendant's Responses to Plaintiff's Interrogatories, Response No. 12.* While, in responding, the Plaintiff has failed to present any direct evidence which demonstrates that the Defendant's distribution of the form letters was intentional, she has identified several facts, in the Record, from which intent, on the part of the Defendant, could be reasonably inferred.

As urged by the Plaintiff, customers will frequently visit a particular pharmacy because of their loyalty to a pharmacist who works there. See, *Plaintiff's Memorandum in Opposition,* at 14; *McCabe Dep.* at 105; *Brown Dep.* at 126. She also notes that, prior to her termination, the Defendant had received letters from customers advising that they frequented K–Mart's pharmacy specifically because of the Plaintiff. See, *Brown Dep.* at 126–127. In fact, after the Defendant discharged the Plaintiff, several customers informed K–Mart that, because the Plaintiff was no longer at the Store, they would no longer frequent the K–Mart pharmacy. *Id.* at 129–130. This loss of customer business was known to the Defendant during the period in which letters were sent out to K–Mart's pharmacy customers, on K–Mart letterhead, which plainly bore the Plaintiff's name as the author of the correspondence. See, *Defendant's Exs. 13, 14, 25–27.* There is also no dispute that these letters bore a commentary that was designed to solicit business, such as, "[S]o please come back in and see us." *Id.*

"Although we are mindful of the Court of Appeals' observation that '[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles,' we decline to rest our denial of Summary Judgment

solely upon that ground." *First State Bank of Floodwood v. Jubie,* 847 F.Supp. 695, 705–06 (D.Minn.1993), quoting *Pfizer Inc. v. International Rectifier Corp.,* 538 F.2d 180, 185 (8th Cir.1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Rather, we place our principal reliance upon those circumstantial facts, as isolated by the Plaintiff, which would allow a Jury to reasonably draw an inference of the Defendant's intent to appropriate the Plaintiff's name. While a Jury need not draw that inference, here the evidence does not "point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party"—here the Plaintiff. *Davis v. Fleming Companies, Inc.,* 55 F.3d 1369, 1371 (8th Cir. 1998), quoting *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991). Accordingly, the Defendant's Motion for Summary Judgment on this issue is be denied.[5]

■ d. *The Defamation Claim.* Under Minnesota law, in order for a statement to be considered defamatory, it must be communicated to someone other than the Plaintiff, it must be false, and it must tend to harm the Plaintiff's reputation or to lower her estimation in the community. See, *Stuempges v. Parke, Davis & Compa-*

ny, 297 N.W.2d 252, 255 (Minn.1980); *Lewis v. Equitable Life Assurance Society,* 389 N.W.2d 876, 886 (Minn.1986). As a consequence, the threshold issue, that we necessarily confront, is that of falsity—whether the Defendant's assertions, that the Plaintiff breached her duty of patient confidentiality, were true.

■ i. *Falsity.* There is little law to guide us on the question of whether the Plaintiff's letter to Lange, in which she referred to Frame's desire to use artificial insemination, constituted a breach of her duty of patient confidentiality. However, it is noteworthy that the Plaintiff claims that she did not obtain the information, upon which she based this statement, from her duties as a pharmacist. In this respect, the Record discloses a factual basis for the Plaintiff's assertion that she learned of Frame's attempts to become pregnant through interoffice gossip. Indeed, given the fact that she did not process Frame's prescription order, for a fertility drug, until well after she wrote her letter to Lange, there is no responsible basis, in this Record, to suggest that the Plaintiff breached Frame's confidences by the Plaintiff's acts in filling Frame's drug prescription.

**5.** We have substantial doubt, however, that the Plaintiff can here prosecute a defamation claim in conjunction with a claim that, simultaneously, the Defendant was seeking to appropriate the name that it is asserted to have tortiously soiled, in order to garner an economic benefit. The theories of recovery would seem to be irreconcilably at odds. Nevertheless, this is an issue that the parties have not addressed, and we suspect that, even if our doubt proves to be correct, the Plaintiff should have the election between her alternative causes of action. We do not suggest that the application of the election of remedies doctrine—which allows a party to seek coexisting and inconsistent remedies that the law affords the same set of facts—would bar the simultaneous prosecution of both the defamation and appropriation claims, for here the conflicting claims require mutually incompatible factual showings, as opposed to allowing alternative remedies. Cf., *Christensen v. Eggen,* 577 N.W.2d 221, 224 (Minn.1998), quoting *Vesta State Bank v. Independent State*

Bank, 518 N.W.2d 850, 855 (Minn.1994); *JCA Partnership v. Wenzel Plumbing & Heating, Inc.,* 978 F.2d 1056, 1061 (8th Cir.1992). Nor do we overlook the fact that, in *Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231 (Minn. 1998), the Minnesota Supreme Court recognized nothing incompatible in advancing a claim that a wrongfully appropriated photograph shed a potentially defamatory light upon the plaintiff. Here, however, the Plaintiff appears to contend that the Defendant falsely accused her of breaching customer confidences, and thereby lessened her reputation as a pharmacist in the community, but used that same purportedly tainted name so as to secure pharmaceutical orders from that same community. In any event, since the issue has not been argued by the parties, and in view of the presently undeveloped state of this area of the law, our analysis can proceed no further at this time, although we do perceive the potential presence of Rule 11 on the horizon.

According to the Defendant, however, the disclosure by a pharmacist of any medical facts about a pharmacy patient, no matter what the source, is a breach of patient confidentiality. See, *McCabe Dep.* at 95–98. The source for that conclusion, however, is obscure. For example, the Defendant's policies and procedure manual designates, as confidential, only "prescription information." *Id.* at 95–96. Similarly, the Minnesota Pharmacy Act treats, as confidential, only "prescription information." See, *Minnesota Statutes Section 151.213.* Moreover, Minnesota Rule 6800.2250, Subpart 1(I), defines as prohibited conduct: "Divulging or revealing to others the nature of professional pharmaceutical services rendered to a patient without the patient's express consent * * *." These contractual, statutory, and regulatory sources do not support the broad secrecy proscriptions to which, apparently, the Defendant held the Plaintiff accountable.

Rather, the Defendant relies upon the case of *Hunter v. Hartman,* 545 N.W.2d 699, 707 (Minn.App.1996), for the general proposition that, when a statement is susceptible to several supportable interpretations, the statement is incapable of carrying a defamatory meaning, even if a reasonable Jury could find that the statement is a mischaracterization. We have no dispute with the holding, in *Hunter,* but the truth or falsity of a statement is typically a Jury question. See, *Lewis v. Equitable Life Assurance Society,* supra at 889. Here, claiming that a person has breached patient confidentiality describes a specific type of conduct which may unfairly reflect upon the Plaintiff's qualifications as a pharmacist. There is nothing vague, or indefinite about the descriptors that the Defendant employed. If, as the Defendant claims, the Plaintiff disclosed information about Frame that was secured from her duties as a pharmacist, then the Jury will have an appropriate basis to accept the Defendant's characterization of the Plaintiff's conduct. We cannot preclude, however, the distinct, and reasonable potentiality, that the Jury will regard the Defendant's characterization as false, and defamatory.

The Plaintiff does not dispute her role as a conduit in the dissemination of workplace gossip, but she was not labeled a "gossiper" by the Defendant; she was labeled a violator of responsibilities unique to her profession, and of sufficient public concern as to warrant the promulgation of statutory and regulatory prohibitions against such conduct. While the Defendant contends that its depiction of the Plaintiff constituted no more than an opinion, which should evade a defamation claim, most derogatory epithets can be characterized as mere opinion, even though they convey a distinct factual meaning. As the Supreme Court observed, in a related context:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); see also, *Toney v. WCCO Television,* 85 F.3d 383, 386 (8th Cir.1996) (accepting that Minnesota law recognizes "defamation by implication").

■ Simply stated, "[t]he doctrine of substantial truth does not apply * * * to a specific, unambiguous statement, even if it is phrased as an opinion." *Stokes v. CBS Inc.,* 25 F.Supp.2d 992, 998 (D.Minn.1998). "Rather, 'the court must look to the nature and obvious meaning of the language in its plain and ordinary sense, construing it as a whole, including innuendos reasonably laid from the statement.' " *Id.,* quoting *Phipps*

*v. Clark Oil & Refining Corp.*, 396 N.W.2d 588, 594 (Minn.App.1986).

 In sum, Minnesota law does not insulate statements of opinion that can reasonably be understood to state facts. *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn.App.1995), rev. denied (Minn., March 14, 1995), cert. denied, 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 34 (1995). Indeed, under one line of Minnesota authority, "private plaintiff/private issue defamation actions must be analyzed under state common law principles." *Weissman v. Sri Lanka Curry House, Inc.*, 469 N.W.2d 471, 473 (Minn.App.1991). As the Court, in *Weissman,* explained:

> Minnesota common law makes no distinction between "fact" and "opinion." A communication is defamatory if it causes enough harm to a person's reputation to lower the community's estimation of the individual or to deter others from associating or dealing with the individual. * * * Epithets or adjectives can constitute defamation if they imply a specific type of reprehensible conduct.

*Id.,* citing *Uhlman v. Farm, Stock & Home Co.*, 126 Minn. 239, 148 N.W. 102 (1914)(describing plaintiffs as "a precious bunch of crooks" and "as straight as a rail fence and as honest as Ananias" was libelous); *Wilkes v. Shields,* 62 Minn. 426, 64 N.W. 921 (1895) (statement that plaintiff was "a dangerous, able and seditious agitator" implied antisocial acts and was defamatory).

In *Weissman,* the Court expressly acknowledged that its State common law analysis was a departure from earlier decisions, such as *Lund v. Chicago & Northwestern Transp. Co.*, 467 N.W.2d 366 (Minn.App.1991), rev. denied (Minn., June 19, 1991), but the Court was "convinced that a proper interpretation of the interaction between Milkovich and current first amendment doctrine require[d][it] to analyze purely private defamation actions under Minnesota common law." *Weissman v. Sri Lanka Curry House, Inc.*, supra at 473 n. 1. We need not here resolve how we believe the Minnesota Supreme Court will address the matter as, under either line of authority, the description of the Plaintiff, as having violated patient confidentiality, is sufficiently specific, and provable, as to be actionable as defamatory. Having reviewed the contested statement, as we must, "in the context in which it was presented, giv[ing] the words their obvious and natural meaning, and consider[ing] the innuendos which follow from the statement," we are satisfied that the words are capable of carrying a defamatory meaning. See, *Michaelis v. CBS, Inc.,* 119 F.3d 697, 700 (8th Cir.1997).

Therefore, an award of Summary Judgment on the issue of falsity would be inappropriate. *Id.* ("If words are reasonably capable of carrying a defamatory meaning, the determination as to whether the communication was in fact defamatory is for the jury."), citing *Conroy v. Kilzer,* 789 F.Supp. 1457, 1462 (D.Minn.1992); see also, *Utecht v. Shopko Dep't Store,* 324 N.W.2d 652, 654 (Minn.1982)("If the words are capable of the defamatory meaning, it is for the jury to decide if they were in fact so understood.").

 ii. *Publication.* The second element of a defamation claim requires that the alleged defamatory statement be communicated to someone other than the Plaintiff, that is, the statement must be published. A statement is published if it is communicated to and understood by at least one person. See, *Stuempges v. Parke, Davis & Co.,* supra at 255.

 On this Record, the Plaintiff has proffered evidence which demonstrates that the Defendant published the alleged defamatory statement to a variety of people who worked at K–Mart. As the Plaintiff notes, McCabe published the alleged defamatory statement orally to Warner and Leach. See, *McCabe Dep.* at 99; *Leach Dep.* at 54–55. Further, the Record reveals that Judy Ricker ("Ricker"), the Store's domestics manager, told Bentz, a third party, that the Plaintiff had been fired for breaching her duty of confiden-

tiality. See, *Bentz Aff*; *Kovatovich Dep.* at 61–62. The Defendant has failed to refute this evidence. Therefore, the Plaintiff has succeeded in raising a genuine issue of material fact on the issue of the publication of the alleged defamatory statements, and an award of Summary Judgment on this issue is inappropriate.[6]

iii. *Damages.* The third element of a defamation claim requires that the Plaintiff demonstrate harm to her reputation. However, as is the case here, allegedly defamatory statements which would affect the Plaintiff in her business, trade, or profession are slanderous *per se,* and actionable, even in the absence of any actual damage. See, *Stuempges v. Parke, Davis & Company,* supra at 255; see also, *Scott Fetzer Co. v. Williamson,* 101 F.3d 549, 555 (8th Cir.1996); *Keenan v. Computer Associates International, Inc.,* 13 F.3d 1266, 1273 (8th Cir.1994); *Lee v. Metropolitan Airport Com'n,* 428 N.W.2d 815 (Minn.App.1988). Since the statements made by the Defendant relate directly to her duties and responsibilities as a professional pharmacist, they are actionable without evidence of actual damage.

Even so, the Plaintiff has testified that, as a result of her termination, and her compelled disclosure of the reasons asserted for her termination, her reputation in the community was damaged. See, *Kovatovich Dep.* at 15–20. The Defendant has not attempted to refute these assertions and, therefore, the Plaintiff has succeeded in raising a genuine issue of material fact on the issue of any claimed damage to her reputation.

iv. *Qualified Privilege.* Finally, in an attempt to elude the Plaintiff's *prima facie* case of defamation, the Defendant has raised a qualified privilege defense. As noted by the Defendant, not every statement, even those which may be personally disparaging to a plaintiff, are actionable as defamatory. For example, statements that are legitimately expressed in a business, employment, or professional context, may be insulated from suit by virtue of a qualified privilege.

Whether a privilege exists is a question of law for the Court's determination. *Conerly v. CVN Companies, Inc.,* 785 F.Supp. 801, 811 (D.Minn.1992); *Lewis v. Equitable Life Assurance Soc.,* supra at 889. In this respect, the law of Minnesota provides as follows:

[A] communication, to be privileged, must be made on a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Lewis v. Equitable Life Assurance Soc.,* supra at 889; quoting *Stuempges v. Parke, Davis & Co.,* supra at 256–57.

In the context of an employer's investigation of employee misconduct, the Minnesota Supreme Court has held:

Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.

*McBride v. Sears Roebuck & Company,* 306 Minn. 93, 235 N.W.2d 371, 374 (1975).

[20] Here, the Defendant's alleged defamatory statements were made in the context of an employee investigation.

---

6. In addition, the Plaintiff avers that she was compelled to self-publish the defamatory statements when applying for subsequent pharmaceutical positions. Under Minnesota law, compelled self-publication, when there is no reasonable means of avoiding the publication, or of avoiding the resulting damage, is adequate to satisfy the publication element of a defamation claim. See, *Lewis v. Equitable Life Assur. Co.,* 389 N.W.2d 876, 888 (Minn. 1986). The Defendant has not competently rebutted the Plaintiff's averments of self-publication.

Therefore, we will assume, without deciding, that all of its agents' statements were made on a proper occasion, and with a proper motive. Nevertheless, we are left to consider whether the alleged defamatory statement—that is, that the Plaintiff breached her duty of confidentiality to a patient—was based upon reasonable or probable cause.

 Whether a party has probable cause to believe that his defamatory statement is true, is a question of law, unless the evidence as to the existence of probable cause leads to more than one conclusion. See, *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380–81 & n. 4 (Minn. 1990); *Brooks v. Doherty, Rumble & Butler*, 481 N.W.2d 120, 125 (Minn.App.1992). When a party making a defamatory statement takes no steps to investigate but, instead, relies entirely upon hearsay, without verification, he has not acted as a reasonably prudent person, and lacks probable or reasonable grounds for making a defamatory statement. See, *Wirig v. Kinney Shoe Corp.* supra at 380–81.

We reject, as without merit, the Defendant's argument that all of its statements were qualifiedly privileged. Here, the evidence concerning the reasonable grounds, if any, that the Defendant possessed, as the basis for its publication of the Plaintiff's asserted breach of patient confidentiality, is plainly susceptible to more than one interpretation. As we have noted, McCabe's investigation of the purported breach of confidentiality was well short of being adequate. McCabe never questioned the Plaintiff, and never investigated

whether the Plaintiff obtained the information, concerning Frame's pregnancy plans, from a prescription that the Plaintiff had processed, even after he had been informed that a prescription was not the source. McCabe merely questioned a few individuals, apparently oblivious to the partialities of those persons. We hasten to add that, in forming this judgment, we do not exercise the acuity of "20/20 hindsight," as we view McCabe's investigation with an appreciation for practical realities. Nevertheless, the investigation he undertook was both starkly superficial, and devoid of objectively verifiable facts.

 Apparently, in the interests of expedition, McCabe was prepared to avoid an inquiry into the timing of the Plaintiff's admitted disclosure to Lange vis-à-vis the date on which K–Mart's pharmacy first processed a fertility prescription from Frame—a straightforward inquiry that would have disproved, on an objectively verifiable basis, any breach, by the Plaintiff, of Frame's confidentiality interests. As a consequence, we conclude that a Jury issue is presented as to the reasonableness of the investigation undertaken by McCabe, and correlatively, as to the propriety of the qualified privilege that the Defendant claims.[7]

In sum, the Defendant's Motion for Summary Judgment is granted in part.

NOW, THEREFORE, It is—

ORDERED:

That the Defendant's Motion for Partial Summary Judgment [Docket No. 13] is

---

7. The Defendant argues that it is entitled to an award of Summary Judgment because the Plaintiff has failed to establish that it abused its qualified privilege by a showing of malice on its part. A qualifiedly privileged statement is not entirely exonerated from a potential liability claim, since the privilege may be eviscerated by a showing of actual malice. See, *Yeldell v. Tutt*, 913 F.2d 533, 541 (8th Cir. 1990); *Conerly v. CVN Companies, Inc.*, 785 F.Supp. 801, 811–12 (D.Minn.1992); *Meleen v. Hazelden Foundation*, 740 F.Supp. 687, 693 (D.Minn.1990), aff'd, 928 F.2d 795 (8th Cir.

1991); *Steinbach v. Northwestern Nat. Life Ins. Co.*, 728 F.Supp. 1389, 1396 (D.Minn. 1989); *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn.1986); *Lewis v. Equitable Life Assurance Soc.*, supra at 890. "Actual malice" is defined as "actual ill will, or a design to causelessly and wantonly to injure plaintiff." *McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 235 N.W.2d 371, 375 (1975). Given our finding, that the Defendant's claimed entitlement to a qualified immunity raises a Jury question, the actual malice issue becomes moot, and we do not address it further.

GRANTED in part, such that the Plaintiff's claims under Minnesota Statutes Sections 325F.67 and .69 are dismissed with prejudice.